Gerald Sobel
Benjamin C. Hsing (*Appearing Pro Hac Vice*)
Jeffrey Horowitz (*Appearing Pro Hac Vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York  10022-3598
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8686

Mark D. Petersen (State Bar No. 111956)
Lucas Huizar (State Bar No. 227111)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

Attorneys for Plaintiff
CHIRON CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHIRON CORPORATION,**<br><br>           **Plaintiff,**<br><br>      **vs.**<br><br>**SOURCECF, INC.; SOURCECF CLINICAL RESEARCH & DEVELOPMENT, L.L.C.; MAXOR NATIONAL PHARMACY SERVICES CORPORATION d/b/a IV SOLUTIONS; FOUNDATION CARE L.L.C.; and PHARMACEUTICAL SPECIALTIES, INC.,**<br><br>           **Defendants.** | **Civil Action No.  C 05-01938 WHA**<br><br>**PLAINTIFF'S TRIAL BRIEF**<br><br>Date:      April 3, 2006<br>Time:     2:00 p.m.<br>Dept:     Courtroom 9, 19th Floor<br>Judge:    Hon. William H. Alsup |

Kaye Scholer LLP

1

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................3

ARGUMENT ...........................................................................................................7

I.     Defendants Are Admitted Infringers of the '907 Patent............................7

II.    Infringement of Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations ................7

    A.     Use of Defendants' 50 mg/ml Tobramycin Formulation with the eFlow®
Device Literally Meets the "About 60 to About 200 mg/ml" Limitation...................8

    B.     Use of Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations
with the eFlow® Device Meets the "About 60 to About 200 mg/ml"
Limitation Under the Doctrine of Equivalents.............................................9

        i.     Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations
Are Insubstantially Different from the "About 60 to About 200
mg/ml" Limitation ...........................................................11

        ii.    Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations
Perform Substantially the Same Function, in Substantially the
Same Way, to Achieve Substantially the Same Result as the
"About 60 to About 200 mg/ml" Limitation................................11

        iii.   Defendants' Arguments Against Equivalence Have No Merit...................12

III.   Defendants Induced Others to Infringe the '907 Patent.............................14

IV.    Defendants Contribute to Infringement of the '907 Patent....................................15

V.     The Compounding Pharmacy Defendants Directly Infringe the '907 Patent ........................16

VI.    Defendants Willfully Infringe the '907 Patent....................................................16

CONCLUSION........................................................................................................17

i

**TABLE OF AUTHORITIES**

Page

**CASES**

*Abbott Laboratories v. Syntron Bioresearch, Inc.*,
    334 F.3d 1343 (Fed. Cir. 2003)....................................................................................8

*Astrazeneca AB v. Mutual Pharm. Co.*,
    384 F.3d 1333 (Fed. Cir. 2004)..................................................................................13

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*,
    210 U.S. 405 (1908)......................................................................................................1

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)..................................................................................15

*Ferguson Bearegard/Logic Controls v. Mega System*,
    350 F.3d 1327 .............................................................................................................14

*Festo Corp. v. Kinzoku Kogyo Kabushiki Co.*,
    234 F.3d 558 (Fed. Cir. 2000)......................................................................................9

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*,
    339 U.S. 605 (1950)......................................................................................................9

*Hilton Davis Chemical Co. v. Warner-Jenkinson Co.*,
    114 F.3d 1161 (Fed. Cir. 1997)..................................................................................12

*Housey Pharms., Inc. v. Astrazeneca UK Ltd.*,
    366 F.3d 1348 (Fed. Cir. 2004)....................................................................................8

*Insituform Techs., Inc. v. Cat Contracting, Inc.*,
    161 F.3d 688 (Fed. Cir. 1998)....................................................................................14

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)..................................................................................10

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH*,
    383 F.3d 1337 (Fed. Cir. 2004)..................................................................................16

*Leggett & Platt, Inc. v. Hickory Springs Manufacturing Co.*,
    285 F.3d 1353 (Fed. Cir. 2002)..................................................................................10

*Manville Sales Corp. v. Paramount System, Inc.*,
    917 F.2d 544 (Fed. Cir. 1990)....................................................................................14

*Modine Manufacturing Co. v. U.S. International Trade Commission*,
    75 F.3d 1545 (Fed. Cir. 1996)......................................................................................8

ii

Kaye Scholer LLP

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005).................................................................................12

*SciMed Life System, Inc. v. Advanced Cardiovascular System, Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001).............................................................................13, 15

*Toro Co. v. White Consolidated Industrial, Inc.*,
    266 F.3d 1367 (Fed. Cir. 2001).................................................................................10

*Vulcan Engineering Co. v. FATA Aluminum, Inc.*,
    278 F.3d 1366 (Fed. Cir. 2002).................................................................................10

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
    520 U.S. 17 (1997)..........................................................................................10, 12, 13

## **STATUTES**

35 U.S.C. § 271(b) ....................................................................................................14

35 U.S.C. § 271(c) ....................................................................................................15

Kave Scholer llp

**PRELIMINARY STATEMENT**

This is a case about deliberate patent infringement.  Plaintiff, Chiron Corporation ("Chiron"), is the owner of United States Patent No. 6,890,907 ("the '907 patent").  The '907 patent describes a novel invention, a method of treating endobronchial (lung) infections through the use of an inhaled tobramycin formulation with a high efficiency nebulizer.  Tobramycin is an antibiotic frequently used in treatment of bacterial infections -- in particular *Pseudomonas aeruginosa* ("Pa") -- in the lungs of cystic fibrosis ("CF") patients.  Claim 1 of the '907 patent reads:

> 1.      A method of treatment of a patient having an endobronchial infection, comprising administering to the patient for inhalation a nebulized unit dose of 4.0 ml or less of an aqueous solution comprising from *about 60 to about 200 mg/ml* of tobramycin in a physiologically acceptable carrier for a duration of nebulization less than about 10 minutes using an inhalation device having a rate of aerosol output of not less than 4 uL/sec that releases at least about 75% of the loaded dose that produces aerosol particles having particle sizes between about 1 $\mu$m to 5 $\mu$m.

(emphasis added).  As the owner of the '907 patent, Chiron has the right to exclude others from practicing its invention.  *See Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 429 (1908).

Defendants, SourceCF, Inc. ("SourceCF"), SourceCF Clinical Research & Development, L.L.C. ("SourceCF R&D"), Maxor National Pharmacy Services Corporation d/b/a IV Solutions ("IV Solutions"), Foundation Care L.L.C. ("Foundation Care") and Pharmaceutical Specialties, Inc. ("PSI") are infringing claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '907 patent.  All Defendants are indirectly infringing (inducing and contributory) and, in addition, Defendants IV Solutions, Foundation Care and PSI are directly infringing, by, *inter alia*, formulating, selling and marketing compounded tobramycin solutions at concentrations of 50 mg/ml and 40 mg/ml for use with a high efficiency nebulizer called the eFlow®, and instructing doctors and patients how to use these tobramycin formulations with the eFlow® in an infringing manner.

PLAINTIFF'S TRIAL BRIEF
C05-01938 WHA

19796\914234.1

1

When Chiron commenced this litigation, Defendants were formulating, selling and marketing compounded tobramycin solutions at a concentration of 100 mg/ml for use with the eFlow®. Defendants immediately admitted that use of their 100 mg/ml tobramycin formulation with the eFlow® infringed the patent in suit.  In fact, Defendants informed the Court that they were "conceding defeat,"[1] "ha[d] NO intention of fighting the lawsuit,"[2] and "decided not to proceed in this litigation."[3]  As admitted infringers, Defendants even took the unusual step of filing for a permanent injunction against themselves.

Rather than cease their admittedly infringing activities, Defendants chose instead to make an insubstantial change to their tobramycin formulations.  Without changing the total dose of medication, and without performing any supporting studies, Defendants reduced the concentration of tobramycin in their formulations from 100 mg/ml to 50 mg/ml and 40 mg/ml.  In order to ensure maintenance of the same total dose of tobramycin, Defendants simply doubled the volume of saline solution and halved the amount of tobramycin.  As will be explained more fully below, in the context of the patent in suit this change is insubstantial, and one of ordinary skill in the art would understand that Defendants' 50 mg/ml and 40 mg/ml formulations are not in any meaningful way different than their admittedly infringing 100 mg/ml formulations; in fact, they are interchangeable.

On December 1, 2005, the Court entered a permanent injunction which effectively enjoins Defendants from filling prescriptions for tobramycin formulations for use with the eFlow® at a concentration of between 60 mg/ml and 200 mg/ml.  In addition, the Court construed the phrase "about 60 to about 200 mg/ml" in claim 1 to mean "approximately 60 to approximately 200 mg/ml."[4]  The Court held "whether any particular concentration of tobramycin outside the range of

---

[1]   Defendants' Motion for Voluntary Entry of Permanent Injunction and Memorandum of Points and Authorities Thereon, at 8.

[2]   Defendants' Prehearing Statement in the Joint Communication re Joint Claim Construction and Prehearing Statement, at 6.

[3]   Defendants' Communication Re Court Ordered Dates for Claim Construction, at 2.

[4]   Order Granting Permanent Injunction, December 1, 2005, at 6.

exactly 60 to exactly 200 mg/ml, (such as 50 mg/ml), would infringe the '907 patent is a question of fact that remains to be decided."[5]  As use of Defendants' 50 mg/ml and 40 mg/ml tobramycin formulations with the eFlow® meet every other claim limitation, Defendants agree that the only remaining issue is whether Defendants' 50 mg/ml and 40 mg/ml formulations meet the "about [approximately] 60 to about [approximately] 200 mg/ml" limitation.[6]

Accordingly, because use of Defendants' 50 mg/ml and 40 mg/ml tobramycin formulations with the eFlow® is insubstantially different than their infringing 100 mg/ml formulations-- and thus insubstantially different  from the "about 60 to about 200 mg/ml limitation -- Chiron seeks a judgment declaring that Defendants are infringing, inducing infringement of and/or contributorily infringing the '907 patent, and a permanent injunction enjoining Defendants from infringing, inducing infringement and/or contributorily infringing the '907 patent.

## **BACKGROUND**

CF is the most common fatal hereditary genetic disease in the United States.  The average life-span of a person suffering from CF is thirty-two years.  There is no cure for CF -- the treatment goal is to maintain health.  CF affects the cells that line the lungs resulting in dry, thick and sticky mucous, which leads to inflammation and progressive destruction of lung tissue.  The sticky mucous makes it difficult to breathe and promotes bacterial infections.  The most common bacterial infection in CF patients is Pa.  The presence of Pa leads to lung damage, loss of lung function and respiratory failure.  The primary treatment of CF is antibiotic therapy, and one method of delivering antibiotic therapy is via inhalation through use of an antibiotic solution, such as tobramycin, with a nebulizer.

Chiron develops and markets biopharmaceuticals, vaccines, and blood safety screening products.  For more than twenty years, Chiron has been an industry leader in providing new treatments for serious diseases such as cancer, multiple sclerosis and CF.  In its relatively short

---

[5]  *Id.*

[6]  *See* Defendants' Motion in Limine No. 1, at 4.

Kave Scholer llp

history, Chiron has grown to a global company with more than 5,000 employees. Much of this success is attributable to Chiron's work in developing antibiotic treatments for CF.

At present, Chiron's TOBI® tobramycin solution for inhalation, USP -- a product which is not an embodiment of the '907 patent -- is the only tobramycin solution for inhalation, and the only antibiotic solution of any type, approved by the United States Food and Drug Administration ("FDA") to treat lung infections in CF patients. TOBI® is the only FDA approved tobramycin solution proven to be safe and effective through extensive human clinical testing. As an FDA approved product, Chiron's manufacturing of TOBI® includes thorough and rigorous quality control and quality assurance systems and processes. The FDA approval process, and the requisite manufacturing quality assurance, is complicated and expensive. Yet, these are important and necessary endeavors, particularly with regard to inhaled medications used to treat a complex and devastating disease such as CF.

The '907 patent describes an attempt to improve upon TOBI®. Scientists working at Chiron invented an inhalable tobramycin formulation for use with a high efficiency nebulizer in order to develop a method of tobramycin treatment for CF patients that could deliver an effective dose of medication to patients in a shorter period of time. The Chiron inventors discovered that reduction in treatment time can be achieved with a higher efficiency nebulizer which allows for a higher concentration of medication in a smaller volume of solution. Faster delivery is desirable because it can improve patient compliance, particularly in younger CF patients. However, although the technology claimed in the '907 patent represents an advance over the prior art, not all methods of treatment that fall within the scope of the patent are necessarily safe and effective from a regulatory standpoint. It is still necessary to undergo the FDA approval process to prove safety and efficacy before providing the method of treatment in a clinical setting.

Defendants, on the other hand, offer the promise of a Chiron-invented and patented product technology without taking steps necessary to ensure that their products are safe and effective. SourceCF is a sales and marketing company that licenses the eFlow® nebulizer from its manufacturer, PARI. SourceCF leases the eFlow® to three compounding pharmacies -- IV

Solutions, Foundation Care and PSI -- who collectively call themselves the Respiratory Disease Network ("RDN"). SourceCF created the RDN for the purpose of marketing and distributing the eFlow® for use with compounded medications, in particular compounded tobramycin solution. The RDN compounding pharmacies, as well as SourceCF, promote the eFlow® to doctors, medical personnel, patients and relatives of patients in the CF community for use with their compounded tobramycin solutions. In addition to filling prescriptions for compounded tobramycin solution for use with the eFlow®, the RDN compounding pharmacies directly interact with patients by instructing patients on how to use the compounded tobramycin solutions with the eFlow®.

SourceCF is the mastermind behind this endeavor that exists for the sole purpose of preying upon the CF patient population's hopes for new therapies. In addition to creating the RDN, SourceCF created and provided to the RDN pharmacists the initial 100 mg/ml formulation of tobramycin solution to be used with the eFlow®. As there are no human clinical studies to support the compounded 100 mg/ml formulation of tobramycin solution for use with the eFlow®, Defendants have instead relied upon *in vitro* (non-living) laboratory studies performed by the manufacturer of the eFlow®, PARI. These PARI *in vitro* studies are designed to show, in an experimental laboratory setting, that a 100 mg/ml formulation of tobramycin solution -- at a total dose of between 140 mg and 200 mg -- when used with the eFlow® generates a comparable respirable dose to the standard FDA approved TOBI® dose.

Total dose is the total amount of tobramycin loaded into the nebulizer, which is calculated by multiplying the concentration (mg/ml) times the volume (ml). In the case of TOBI®, the standard total dose is 300 mg (60 mg/ml x 5 ml). Respirable dose is the percentage of aerosolized particles that are of the appropriate size to potentially be deposited in the endobronchial region of a patient in order to treat the infection. Defendants provide the 100 mg/ml respirable dose *in vitro* studies to the CF community in an effort to support and promote use of the eFlow® with the RDN compounded tobramycin solutions by suggesting that their product can provide the same respirable dose as the FDA approved TOBI®, but in a shorter period of time.

When Defendants changed their compounded tobramycin formulations to concentrations of 50 mg/ml and 40 mg/ml, Defendants recognized that they needed to maintain the same total dose in order to achieve the same respirable dose as their 100 mg/ml formulations. In other words, the 50 mg/ml and 40 mg/ml formulations are deliberately designed to be qualitatively no different than the 100 mg/ml formulations. SourceCF has now commissioned, and is financing, new *in vitro* respirable dose studies with the RDN's 50 mg/ml and 40 mg/ml tobramycin formulations with the eFlow®. The purpose of these bench studies is to show that Defendants' 50 mg/ml and 40 mg/ml formulations when used with the eFlow® will generate a respirable dose of tobramycin comparable to the original infringing 100 mg/ml formulations, and to Chiron's FDA approved TOBI®; of course, this is designed to be achieved only by maintaining the same total dose of medication. In sum, when used with the eFlow®, a 50 mg/ml concentration of tobramycin solution in a 3 ml volume (150 mg total dose), and a 40 mg/ml concentration of tobramycin solution in a 3.75 ml volume (150 mg total dose) will produce about the same respirable dose as a 100 mg/ml concentration of tobramycin solution in a 1.5 ml volume (150 mg total dose). All of these formulations, when used with the eFlow®, are captured by the limitations set forth in the asserted claims of the '907 patent.

In addition to infringing the '907 patent, Defendants have not accepted the burdens commensurate with ethical development of new CF therapies. Defendants have promoted their drug-device combination to the CF community even though it has not been approved by the FDA, and without having demonstrated through clinical trials that the benefits of their product outweigh its risks. Moreover, the compounding pharmacies make their drug products on an *ad hoc* basis by operating in a regulatory gray area outside the scope of FDA oversight. Products made by compounding pharmacies are not subject to the same strict quality control and quality assurance processes employed by FDA approved drug manufacturers like Chiron. Hence, the RDN's compounded tobramycin solutions are not manufactured to the same standards as Chiron's FDA approved TOBI® product.

In contrast, Chiron is dedicated to improving the lives of patients suffering from CF. Chiron has invested, and continues to invest, heavily in research as it works to develop even better

Kave Scholer llp

treatments for CF patients.  For example, when Chiron developed the method set forth in the '907 patent, Chiron filed an Initial New Drug ("IND") application with the FDA.  The examples in the '907 patent are actual human clinical studies performed in support of the IND.  Defendants, of course, have never performed any studies of their own in support of their infringing method (and SourceCF even went so far as to attach copies of the '907 patent examples as clinical studies in support of a Suitability Petition filed in an effort to make a generic copy of TOBI®).  Furthermore, Chiron is currently conducting Phase III clinical trials to test a tobramycin powder for inhalation ("TIP") that is delivered to patients in a dry powder form using a small hand-held device that operates without electricity.  TIP has the potential to offer a safe and efficacious therapy with extremely fast drug deliver as well as full portability.  Unlike Defendants, Chiron is investing the time and resources to appropriately develop TIP through the FDA regulatory approval process.

## ARGUMENT

### I.    Defendants Are Admitted Infringers of the '907 Patent

Shortly after Chiron filed this lawsuit, Defendants admitted that use of their original 100 mg/ml tobramycin solution with the eFlow® nebulizer literally meets each and every limitation of at least claim 1 of the '907 patent.  As a result, the Court entered a permanent injunction barring Defendants from continuing with their infringing activities.  Defendants are thus admitted and adjudged infringers of the '907 patent.

### II.    Infringement of Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations

Instead of stopping their infringing activities altogether, Defendants made a trivial modification to their 100 mg/ml tobramycin formulations, lowering the tobramycin concentration to 50 mg/ml or 40 mg/ml.  But use of Defendants' 50mg/ml and 40 mg/ml tobramycin solutions with the eFlow® nebulizer still infringes claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '907 patent.  The sole remaining issue is whether use of Defendants' 40 mg/ml or 50 mg/ml tobramycin solution with the eFlow® nebulizer meets the "about 60 to about 200 mg/ml" limitation, as Defendants have already

admitted that the remaining limitations of claim 1 are met.  At trial, Chiron will prove that use of

Defendants' 50 mg/ml tobramycin solutions with the eFlow® device meets the "about 60 to about

200 mg/ml" limitation either literally or under the doctrine of equivalents, and that use of

Defendants' 40 mg/ml tobramycin solutions with the eFlow® device meets this limitation under the

doctrine of equivalents.

### A.   Use of Defendants' 50 mg/ml Tobramycin Formulation with the eFlow® Device Literally Meets the "About 60 to About 200 mg/ml" Limitation

Claim 1 recites, *inter alia*, "administering to the patient for inhalation a nebulized unit dose

of 4.0 ml or less of an aqueous solution comprising from about 60 to about 200 mg/ml of tobramycin

in a physiologically acceptable carrier."  The Court has construed the "about 60 mg/ml to 200

mg/ml" limitation to mean "*approximately* 60 mg/ml to *approximately* 200 mg/ml."  (Order

Granting Permanent Injunction, December 1, 2005, at 5).  To determine whether Defendants' 50

mg/ml formulation falls within the literal scope of this limitation, the Court must look at the

underlying technology of the invention.  *See Modine Mfg. Co. v. U.S. International Trade Comm'n.*,

75 F.3d 1545, 1554 (Fed. Cir. 1996) ("When the claims are applied to an accused device, it is a

question of *technologic fact* whether the accused device meets a reasonable meaning of 'about' in

the particular circumstances.") (emphasis added).  In addition, the "about 60 mg/ml to 200 mg/ml"

limitation cannot be viewed in a vacuum.  Other limitations must also be considered.  *See Housey*

*Pharms., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352  (Fed. Cir. 2004) (stating that "a claim

must also be considered in the context of the intrinsic evidence, namely the claims, the specification,

and the prosecution history"); *Abbott Labs v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1351 (Fed.

Cir. 2003) ("The usage of the disputed claim terms in the context of the claims as a whole also

informs the proper construction of the terms.").

In evaluating the appropriate scope of "about," the technology of the '907 patent compels

that the total dose contemplated by the invention must be considered.  Here, the '907 patent

expressly discloses that the concentration ("about 60 to about 200 mg/ml") and volume ("less than 4

ml") limitations are interrelated and must be viewed relative not only to each other but to the other claim limitations as well:

> In order to deliver *the relatively small volumes of the relatively high concentration* aminoglycoside antibiotic formulations to the patient for inhalation in the relatively short dosing periods of the invention, the antibiotic formulations are preferably administered with the use of an inhalation device having a relatively high rate of aerosol output.

('907 patent, col. 6, lines 25-30) (emphasis added).  Furthermore, claim 1 recites a "dose" limitation that comprises both the volume and concentration limitations: "a nebulized unit *dose* of *4.0 ml or less* of an aqueous solution comprising from about *60 to about 200 mg/ml* of tobramycin." (Emphasis added.)

One having ordinary skill in the art would recognize that the scope of "about" allows for some variation in the tobramycin concentration, particularly where the dose remains the same.  It turns out, when Defendants lowered the concentration of their tobramycin formulations from 100 mg/ml to 50 mg/ml after entry of the Court's permanent injunction, Defendants increased the volume of the solution to compensate for the lower drug concentration, while keeping the volume of their formulations squarely within the "less than 4 ml" limitation   As a result, the dose of Defendants' 50 mg/ml formulations is the *same* as the their admittedly infringing 100 mg/ml formulations.  In addition, a concentration of 50 mg/ml is merely a 7% deviation from the claimed overall range of "about 60 to about 200 mg/ml."  Accordingly, Defendants' 50 mg/ml formulation literally falls within the scope of the "about 60 to about 200 mg/ml."

**B.   Use of Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations with the eFlow® Device Meets the "About 60 to About 200 mg/ml" Limitation Under the Doctrine of Equivalents**

The doctrine of equivalents guards patentees against the application of strict literalism in determining infringement, and "prevents an accused infringer from avoiding liability for infringement by changing only minor or insubstantial details of a claimed invention while retaining the invention's essential identity."  *Festo Corp. v. Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 564 (Fed. Cir. 2000) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

That is precisely what Defendants have done.  As discussed above, all Defendants did was lower the tobramycin concentration and increase correspondingly the volume of the solution, thereby keeping the tobramycin dose in Defendants' 50 mg/ml and 40 mg/ml solutions the *same* as the dose in the original 100 mg/ml solution.  What Defendants did is akin to taking two Tylenol® tablets each with a 300 mg dose instead of taking a single tablet with a 600 mg dose.

A claim element is equivalently present in an accused process if "insubstantial differences" distinguish the missing claim element from the corresponding features in the accused  process. *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1359 (Fed. Cir. 2002).  This test is determined from the viewpoint of one having ordinary skill in the art.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997).  The Supreme Court has said that known interchangeability between two elements is an important factor in determining whether the elements are insubstantially different.  *Warner-Jenkinson Co*, 520 U.S. at 36; *see also Vulcan Eng'g Co. v. FATA Aluminum, Inc.*, 278 F.3d 1366, 1374 (Fed. Cir. 2002).  "[T]he known interchangeability test looks to the knowledge of a skilled artisan to see whether that artisan would contemplate the interchange as a *design choice*."  *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1383 (Fed. Cir. 2001) (emphasis added).  Accordingly, expert testimony is highly probative to prove equivalence.

Courts have also applied the triple identity test, that is, if a feature in the accused process performs substantially the same function, in substantially the same way, to achieve substantially the same result, as the claimed element, then they are equivalent.  *See Toro Co. v. White Consolidated Indus., Inc.*, 266 F.3d 1367, 1370 (Fed. Cir. 2001).

As will be shown below, Defendants' 50 mg/ml and 40 mg/ml tobramycin formulations equivalently meet the "about 60 to about 200 mg/ml" limitation under both the "insubstantial differences" and the triple identity tests.

Kave Scholer llp

i.      **Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations Are Insubstantially Different from the "About 60 to About 200 mg/ml" Limitation**

At trial, Chiron will present expert testimony that Defendants' 50 mg/ml and 40 mg/ml tobramycin solutions are insubstantially different from the "about 60 to about 200 mg/ml" limitation because use of Defendants' solutions with the eFlow® device would deliver substantially the same respirable dose – i.e., the percentage of the loaded dose that may potentially reach the patients' lungs -- as the solution having the claimed limitation.  Moreover, Chiron will introduce testimony from Defendants' own witnesses stating that use of the 50 mg/ml and 40 mg/ml solutions with the eFlow® would deliver the same dose as Defendants' original 100 mg/ml solution, which admittedly falls literally within the scope of the "about 60 to about 200 mg/ml" limitation.

In addition, Chiron will present calculations showing that the airway surface liquid concentration of tobramycin is substantially the same when a 50 mg/ml solution or a 40 mg/ml solution is inhaled via the eFlow® nebulizer as it is when a 60 mg/ml solution is inhaled via the same nebulizer.  That is, substantially the same amount of drug is found in the patient's airways.

Overwhelming evidence thus supports Chiron's contention that Defendants' 50 mg/ml and 40 mg/ml solutions are interchangeable with, and equivalent to, the claimed "about 60 to about 200 mg/ml" solution.  *See Warner-Jenkinson,* 520 U.S. at 36.

ii.     **Defendants' 50 mg/ml and 40 mg/ml Tobramycin Formulations Perform Substantially the Same Function, in Substantially the Same Way, to Achieve Substantially the Same Result as the "About 60 to About 200 mg/ml" Limitation**

Defendants' 50 mg/ml and 40 mg/ml formulations perform substantially the same function as the claimed "about 60 to about 200 mg/ml" formulation: they are both aqueous solutions aerosolized in a nebulizer.  Defendants' 50 mg/ml and 40 mg/ml formulations perform that function in substantially the same way as the claimed "about 60 to about 200 mg/ml" formulation: both formulations when aerosolized are designed to deliver the same respirable dose of tobramycin to patients.  Finally, Defendants' 50 mg/ml and 40 mg/ml formulations are intended to achieve

substantially the same result as the claimed "about 60 to about 200 mg/ml" formulation: treatment of lung infections.

### iii.     Defendants' Arguments Against Equivalence Have No Merit

At trial, Defendants will not offer any expert testimony to rebut Chiron's expert evidence that Defendants' 40 mg/ml and 50 mg/ml tobramycin formulations are equivalent to, or interchangeable with, the claimed "about 60 to about 200 mg/ml" formulation.  Grasping at straws, Defendants falsely assert that Chiron's equivalence case is based on combining the concentration ("about 60 to about 200 mg/ml") and volume ("less than 4 ml") limitations of claim 1 into a single limitation. Defendants' argument appears to be that under the "all limitations rule" in determining whether the "about 60 to about 200 mg/ml" limitation is met under the doctrine of equivalents, this limitation must be viewed in a vacuum without regard to the context of the invention or the other limitations of the claims.  This approach is not and has never been the law governing the doctrine of equivalents. Instead, in determining equivalence, the Supreme Court has made clear that each limitation must be analyzed in view of the claim as a whole:

> An analysis of the role played by each element *in the context of the specific patent claim* will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Warner-Jenkinson*, 520 U.S. at 40 (emphasis added).

The "all limitations rule provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation."  *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1379 (Fed. Cir. 2005).  Here, Chiron's theory of equivalence vitiates no claim limitation. The "about 60 to about 200 mg/ml" limitation is equivalently met by Defendants' 50 mg/ml and 40 mg/ml solutions.  This reasoning is consistent with the Federal Circuit's ruling in *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 114 F.3d 1161 (Fed. Cir. 1997), in which the Court held that the limitation of "from approximately 6.0 to 9.0" pH was equivalently met by a pH of 5.0.  *Id.* at 1164.

Defendants further argue that under the so-called "specification disclaimer estoppel" doctrine, Chiron is barred from asserting that tobramycin formulations with concentrations below 60 mg/ml are equivalent to the "about 60 to 200 mg/ml" limitation in claim 1 of the '907 patent because such formulations were explicitly disclaimed by Chiron in U.S. Patent No. 5,508,269 ("the '269 patent"). Defendants' argument is baseless. As an initial matter, Chiron has seen no case that uses the term "specification disclaimer estoppel." In fact, this term appears even *not once* in any of the cases that Defendants cite in support of their motion *in limine* regarding this issue.

To the extent that a patentee may be precluded from invoking the doctrine of equivalents to recapture subject matter disclaimed in the patent specification, Federal Circuit precedents make clear that for this rule to apply, the patent specification must have "specifically identified, criticized, and disclaimed" the equivalent subject matter. *See, e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001); *Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1342 (Fed. Cir. 2004) (holding that only a "clear disavowal" of subject matter precludes the application of doctrine of equivalents to recapture that subject matter). Nowhere in the '907 patent is there any specific identification, criticism, and disclaimer or clear disavowal of tobramycin formulations having concentrations below 60 mg/ml. To the contrary, the use of the modifier "about" in the specification and the claim limitation "about 60 to about 200 mg/ml" clearly demonstrates that patentee intended to cover concentrations below 60 mg/ml.

Defendants' argument that statements made in the '269 patent somehow constitute a disclaimer in the patent in suit makes no sense at all. The '269 patent is *not* the patent in suit. None of the inventors of patent in suit is an inventor of the '269 patent. The '269 patent is a prior art reference that discloses and claims an invention that is different from the claimed invention. Accordingly, even assuming *arguendo* that concentrations below 60 mg/ml were disclaimed in the '269 patent, it cannot possibly be attributed to the inventors of the patent in suit.

Although the '907 patent incorporates the disclosure of the '269 patent by reference, Defendants have cited *no* case, and Chiron is not aware of any case, holding or suggesting that statements made in a patent incorporated by reference can constitute a disclaimer. Certainly,

statements made in a prior art patent incorporated by reference cannot rise to the level of a specific

identification, criticism, and disclaimer that is necessary to establish a clear disavowal of equivalent

subject matter. *See SciMed*, 242 F.3d at 1345.

Moreover, any supposed disclaimer made in the '269 patent has nothing to do with the

accused embodiment that Chiron seeks to prove as within the equivalent scope of the claims of the

patent in suit. The '269 patent discloses a prior art formulation used with a *low* efficiency nebulizer

and not the *high* efficiency eFlow® device used by Defendants and covered by the patent in suit.

Thus, to the extent that the '269 patent suggests that concentrations below 60 mg/ml are not

desirable, such suggestion is applicable only to the prior art methodology and simply does not apply

to the use of the accused tobramycin solutions with the high efficiency eFlow® device.

Finally, Defendants' argument that the '269 patent disclaims concentrations below 60 mg/ml

is plain wrong and is based on a complete distortion of the '269 patent disclosure. Indeed, the '269

patent expressly teaches that concentrations below 60 mg/ml can be used:

Although in some instances both lower or higher doses, *typically from 40-80 mg/ml may be advantageously used*, the 60 mg/ml dose of tobramycin is preferred.

The '269 patent, col. 8, lines 5-7 (emphasis added).

## III.    Defendants Induced Others to Infringe the '907 Patent

Under 35 U.S.C. § 271 (b), "one who actively induces infringement of a patent shall be liable

as an infringer." To succeed on a claim of inducement, "the plaintiff has the burden of showing that

the alleged infringer's actions induced infringing acts *and* that he knew or should have known his

actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d

544, 553 (Fed. Cir. 1990); *Ferguson Beauregard/Logic Controls v. Mega Sys.*, 350 F.3d 1327, 1342.

(Fed. Cir. 2003). In addition, plaintiff must show the "alleged infringer has actual or constructive

knowledge of the patent." *Insituform Techs., Inc. v. Cat Contracting, Inc.* 161 F.3d 688, 695 (Fed.

Cir. 1998).

As discussed above, use of Defendants' 50 mg/ml and 40 mg/ml tobramycin formulations

with the eFlow® nebulizer directly infringes the '907 patent, and Defendants have been actively

PLAINTIFF'S TRIAL BRIEF
C05-01938 WHA
14
19796\914234.1

Kave Scholer llp

encouraging others -- *i.e.*, doctors and patients -- to engage in such use.  Although Defendants have been aware of the '907 patent since shortly after it issued, this knowledge did not stop Defendants from actively promoting the use of their 50 mg/ml and 40 mg/ml tobramycin solutions with the eFlow® nebulizer through emails, letters, marketing strategies, and telephone hotlines aimed at both doctors and patients, as well as instructing doctors and patients how to use the 40 mg/ml and 50 mg/ml tobramycin solutions for use with eFlow® in an infringing manner.  Accordingly, Defendants are inducing infringement of the '907 patent.

**IV.      Defendants Contribute to Infringement of the '907 Patent**

35 U.S.C. § 271(c) states:

[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented . . . combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

To succeed on a claim of contributory infringement, "plaintiff must show that defendant 'knew that the combination for which its components were especially made was both patented and infringing" and that defendant's components have "no substantial non-infringing uses.'"  *Cross Med. Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005) (quoting *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004)).

Here, Defendants' 50 mg/ml and 40 mg/ml tobramycin formulations are especially made for use with the eFlow® nebulizer in a manner that infringes the '907 patent.  Moreover, the 40 mg/ml and 50 mg/ml tobramycin formulations have no substantial non-infringing uses.  Accordingly, by providing the 50 mg/ml and 40 mg/ml formulations to patients and doctors, the RDN compounding pharmacies are contributing to the infringement of the '907 patent.

Similarly, the eFlow® nebulizer is especially adapted for use with Defendants' 50 mg/ml and 40 mg/ml tobramycin formulations in an infringing manner, and has no substantial non-infringing uses.  Although the eFlow® has been used with other medications, a substantial number of the uses

for the eFlow® device are with the accused tobramycin formulations.  Accordingly, by providing the eFlow® device to doctors and patients, Defendants are also liable as contributory infringers.

**V.      The Compounding Pharmacy Defendants Directly Infringe the '907 Patent**

The compounding pharmacies, IV Solutions, Foundation Care, and PSI, are also directly infringing the asserted claims of the '907 patent because they are "administering to the patient" their 40 and 50 mg/ml tobramycin solutions for use with the eFlow® nebulizer.  The ordinary meaning of "administer" is "to mete out" or "to give remedially (as medicine)."  Webster's Third New International Dictionary of the English Language Unabridged, (2002).  And it is undisputed that the compounding pharmacies give or mete out their tobramycin formulations and the eFlow® nebulizer to patients.

**VI.     Defendants Willfully Infringe the '907 Patent**

Defendants willfully infringe the '907 patent because they did not exercise an affirmative duty of due care to avoid infringement.  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH*, 383 F.3d 1337, 1345 (Fed. Cir. 2004).  Defendants became aware of the '907 patent shortly after it issued.  Yet, Defendants did nothing to avoid infringement, and two of the Defendants -- Foundation Care and IV Solutions -- continued to fill prescriptions at 100 mg/ml.  Furthermore, Defendants intend that their 50 mg/ml and 40 mg/ml tobramycin formulations provide the same respirable dose as their admittedly infringing 100 mg/ml formulation, and thus are equivalent to the 100 mg/ml formulation, but Defendants' choose to proceed to market their 50 mg/ml and 40 mg/ml formulations as well as encourage doctors and patients to use them in combination with the eFlow® device.

Although Defendant SourceCF obtained an infringement opinion from counsel, it did not do so until after Defendants began their infringing activities.  Moreover, SourceCF did not even share this opinion with the other Defendants, IV Solutions, PSI, and Foundation Care.  In any event, the opinion obtained by SourceCF is incompetent.  As Chiron will establish at trial, the opinion is based on a misapplication of the law as well as a distortion of the facts.

PLAINTIFF'S TRIAL BRIEF
C05-01938 WHA

16

19796\914234.1

1

**CONCLUSION**

2      For the foregoing reasons, the evidence at trial will demonstrate that Defendants are

3  infringing, inducing infringement of, and contributory infringing the '907 patent.

4

5  DATED:  March 27, 2006                    FARELLA BRAUN & MARTEL LLP

6

7                                            By:_____/s/_____
                                                Mark D. Petersen
8
                                             Attorneys for Plaintiff
9                                            CHIRON CORPORATION

10                                           Gerald Sobel
                                             Benjamin C. Hsing
11                                           Jeffrey Horowitz
                                             KAYE SCHOLER LLP
12
                                             Of Counsel for Plaintiff
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S TRIAL BRIEF
C05-01938 WHA                                                           19796\914234.1