United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHIRON CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>SOURCECF INC., SOURCECF CLINICAL RESEARCH & DEVELOPMENT, L.L.C., MAXOR NATIONAL PHARMACY SERVICES CORPORATION d/b/a IV SOLUTIONS, FOUNDATION CARE L.L.C., and PHARMACEUTICAL SPECIALTIES, INC.,<br><br>        Defendants.<br>                                                    / | No. C 05-01938 WHA<br><br><br>**ORDER RE DEFENDANTS' MOTIONS *IN LIMINE* NOS. 1 AND 2** |

**INTRODUCTION**

In this patent dispute, defendants bring two motions *in limine* which both essentially seek to prevent plaintiff Chiron Corporation from arguing infringement via the doctrine of equivalents. At this juncture, plaintiff will be allowed to present evidence on the doctrine of equivalents, but defendants are free to re-raise these arguments in the context of a motion under Federal Rule of Civil Procedure 50. Accordingly, defendants' first and second motions *in limine* are **DENIED WITHOUT PREJUDICE**.

**STATEMENT**

Plaintiff Chiron Corporation is the owner of United States Patent No. 6,890,907 ("the '907 patent"). The '907 patent discloses a method of treating lung infections, namely an

inhaled tobramycin formulation used with a high efficiency nebulizer, particularly for patients suffering from cystic fibrosis. Defendants are alleged to infringe, induce infringement of and/or contributorily infringe one or more claims of the '907 patent by (1) selling a product called the eFlow® inhaler and (2) instructing doctors and patients how to use it.

On December 1, 2006, this Court granted plaintiffs the following stipulated permanent injunction (December Order at 6):

> Defendants are preliminarily and permanently enjoined from making, using, offering for sale, selling, promoting or importing into the United States any tobramycin formulation in an aqueous solution comprising from 60 to 200 mg/ml of tobramycin in a physiologically acceptable carrier in a nebulized unit dose volume of 4.0 ml or less for use in the eFlow® Electronic Inhaler by PARI or a similar inhalation device having a rate of aerosol output of not less than about 4µl/sec, releases at least about 75% of the loaded dose, and produces aerosol particles having particle sizes between about 1 µm to about 5µ, for a duration of nebulization of less than about 10 minutes. Defendants are further enjoined from instructing doctors or patients in such use.

Still in dispute after the injunction was whether defendants' product, which purportedly allows for effective treatment of CF with 40 mg/ml and 50 mg/ml concentrations of tobramycin, infringed plaintiff's patent. As the December order explained (*id*. at 5) (emphasis in original):

> The remaining dispute, however, is *not* one of claim construction. It is a question of *infringement* that remains to be decided another day. As plaintiff correctly points out, even if a 50 mg/ml tobramycin formulation does not literally infringe, a jury could still find defendants liable under a doctrine of equivalents theory, (assuming that no prosecution history estoppel applies). In other words, reasonable jurors could find that a person of ordinary skill in the art would know that a lower dosage performs substantially the same function, in substantially the same way, to reach substantially the same result.

In defendants' first motion *in limine*, they seek to prevent evidence that defendants infringed the '907 patent by duplicating the total *volume* of tobramycin, regardless of the fact that defendants' product accomplishes the desired results with concentrations of tobramycin of less than 60 mg/ml. Plaintiff maintains that defendants have merely modified an earlier infringing product (which contained 100 mg/ml of tobramycin) by adding a higher volume of saline. This, it is argued, is like taking a 600 mg headache reliever, dividing it into two caplets, and representing the two 300 mg tablets as an advance. Essentially, this is a claim for

2

1  infringement under the doctrine of equivalents.  Defendants counter that as long as they avoid
2  one limitation of the claim language, the limitation for concentrations of "about" 60 mg/ml,
3  they are not infringing the '907 patent.  According to defendants, the argument regarding total
4  volume vitiates the claim language, and thus they seek to bar this particular application of the
5  doctrine of equivalents.

6  In defendants' second motion *in limine*, they attempt to remove the doctrine of
7  equivalents from the picture completely.  According to defendants, the '907 patent incorporated
8  by reference United States Patent No. 5,508,269 ("the '269 patent").  In the '269 patent, it is
9  argued, formulations containing less than 60 mg/ml of tobramycin were disclaimed.  On
10 defendants' view, this estops plaintiff from proving that defendants' products, which involve
11 such lower concentrations, infringe plaintiff's patent under the doctrine of equivalents.

**ANALYSIS**

"The standard for infringement under the doctrine of equivalents has often been articulated:  infringement may be found if an accused device performs substantially the same function in substantially the same way to achieve substantially the same result." *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991).  "The doctrine of equivalents must be applied on an element by element basis." *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 877 (Fed. Cir. 1998) (*citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997)).

**1.   TOTAL VOLUME.**

Defendants rely on the "element by element" test for the proposition that plaintiff cannot argue infringement based on the total volume of tobramycin in defendants' products. Defendants argue that the only issue remaining is concentration—whether or not defendants' products with concentrations below 60 mg/ml tobramycin violated the concentration limitation in plaintiff's patent.  Any evidence regarding total volume, it is argued, is irrelevant.

Plaintiff, however, maintains that when applying the doctrine of equivalents, a court must not take a myopic view of the claim, but rather must look to the totality of circumstances. "[C]ourts must consider the totality of circumstances of each case and determine whether the

3

1  alleged equivalent can be fairly characterized as an insubstantial change from the claimed
2  subject matter without rendering the pertinent limitation meaningless." *Pfizer, Inc. v. Teva*
3  *Pharms. USA, Inc.*, 429 F.3d 1364 (Fed. Cir. 2005).

4  Without knowing more about defendants' products, it is premature to assess whether the
5  products should be characterized as an insubstantial change from the subject matter of the '907
6  patent. After hearing evidence at the bench trial, the Court will be in a better position to assess
7  the legal sufficiency of defendants' argument. Defendant will at that time be able to raise this
8  issue again via a Rule 50 motion.

9  **2.   SPECIFICATION DISCLAIMER ESTOPPEL.**[1]

10  Moreover, under certain circumstances a plaintiff is barred from relying on the doctrine
11  of equivalents. "A particular structure can be deemed outside the reach of the doctrine of
12  equivalents because that structure is clearly excluded from the claims whether the exclusion is
13  express or implied." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d
14  1337, 1345 (Fed. Cir. 2001); *see also Gaus v. Conair Corp.*, 363 F.3d 1284, 1291 (Fed. Cir.
15  2004) ("[T]he patentee cannot reclaim that surrendered claim coverage by invoking the doctrine
16  of equivalents"); *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharmaceutical*
17  *Co., Inc.*, 384 F.3d 1333, 1342 (Fed. Cir. 2004) ("The specification's clear disavowal of
18  nonsurfactant solubilizers precludes the application of the doctrine of equivalents to recapture
19  the disavowed solubilizers"). The test for "specification disclaimer estoppel" thus is whether
20  the patentee *clearly disclaimed* the contested structure.

21  It is important to note that application of such estoppel is a legal question, not a question
22  of fact. "A patent applicant may limit the scope of any equivalents of the invention by
23  statements in the specification that disclaim coverage of subject matter. Such limitations on the
24  scope of equivalents are legal determinations . . . ." *Frank's Casing Crew & Rental Tools, Inc.*
25  *v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1376 (Fed. Cir. 2004) (*citing J & M Corp. v.*
26  *Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed. Cir. 2001)).

---

[1] This term apparently was coined by defendants, but it accurately captures the legal argument so this order adopts the term.

4

### A.   INCORPORATION BY REFERENCE.

As an initial matter, a determination must be made as to whether and to what extent the purported disclaimers in the earlier '269 patent were incorporated by reference in the '907 patent. "To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). *See also Manual of Patent Examining Procedure*, § 2163.07(b) (8th ed. 2006). "Whether and to what extent material has been incorporated by reference into a host document is a question of law." *Advanced Display*, 212 F.3d at 1283.

Here, the '907 patent contained the following language (col. 3, lines 18–33) (emphasis added):

> A preservative-free, stable and convenient formulation of tobramycin (TOBI® tobramycin solution for inhalation; 60 mg/mL tobramycin in 5 mL of 1/4 normal saline) for administration via jet nebulizer was developed by PathoGenesis Corporation, Seattle, Wash. (now Chiron Corporation, Emeryville, Calif.). The combination of a 5 mL BID TOBI dose (300 mg tobamycin) and the PARI LC PLUS/PalmoAide compressor delivery system was approved under NDA 50-753, December 1997, for the management of *P. aeruginosa* in CF patients, and remains the industry standard for this purpose. The aerosol administration of a 5ml dose of a formulation containing 300 mg of tobramycin in quarter normal saline for the suppression of *P. aeruginosa* in the endobronchial space of a patient *is disclosed in U.S. Pat. No. 5,508,269, the disclosure of which is incorporated herein in its entirety by this reference*.

This language was sufficient to incorporate the earlier patent by reference in its entirety. Plaintiff does not really dispute this conclusion (Opp. 3). Rather, plaintiff disputes the import and extent of such incorporation.

Plaintiff argues that materials incorporated by reference should not be read to limit claims in subsequent patents. It is certainly the case that where a patentee so clearly incorporates materials by reference, however, that the patent is to be interpreted with those materials in mind. "When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316,

5

1    1329 (Fed. Cir. 2001).  Indeed, the whole point of incorporation by reference is to make the

2    material part of the patent:

> Instead of repeating some information contained in another document, an application may attempt to incorporate the content of another document or part thereof by reference to the document in the text of the specification.  *The information incorporated is as much a part of the application as filed as if the text was repeated in the application, and should be treated as part of the text of the application as filed.*

7    *Manual of Patent Examining Procedure*, § 2163.07(b) (8th ed. 2006) (emphasis added).

8    Accordingly, there are several circumstances in which courts have considered materials incorporated by reference.  Such materials have been considered when determining whether a patent is invalid due to anticipation.  *See, e.g.*, *Advanced Display*, 212 F.3d at 1282 ("Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document").  The materials have been considered for purposes of determining sufficiency of enablement.  *See, e.g.*, *In re Howarth*, 654 F.2d 103, 106 (C.C.P.A. 1981).  Finally, materials incorporated by reference have been considered in construing patent terms.  *See, e.g.*, *Neutrino Dev. Corp. v. Sonosite, Inc.*, 410 F. Supp. 2d 529, 537 (S.D. Tex. 2006) ("Ambiguous terms within the patent can sometimes be interpreted in light of disclosures made in the materials incorporated by reference"); *Intel Corp. v. Altima Commc'ns, Inc.*, 275 F. Supp. 2d 1236, 1253 (E.D. Cal. 2003).[2]

### B. SPECIFICATION DISCLAIMER IN THE '269 PATENT.

Even so, it remains to be determined whether the '269 patent clearly disclaimed equivalent products containing concentrations of tobramycin of less than 60 mg/ml.

Here, the '269 patent contained the following language (col. 6, lines 38–47):

> Typically, two to four, preferably 300 mg of tobramycin is dissolved in 5 ml solution of a diluted quarter normal saline, preferably containing 0.225% NaCl.
>
> The most preferred aerosol tobramycin formulation according to the invention contains 300 mg of tobramycin sulfate per 5 ml of the quarter normal saline.  This corresponds to 60

---

[2] Contrary to plaintiff's argument, it does not matter that the '269 patent is a different patent with different inventors.  A patentee may, in fact, incorporate by reference any source "which is available to the public."  *In re Howarth*, 654 F.2d at 106.

6

> mg/ml of tobramycin which is minimal yet efficacious amount of tobramycin to suppress the *Pseudomonas aeruginosa* infection in endobronchial space.

The '269 patent further provided (col. 8, lines 3–41) (emphasis added):

> The formulated dose of 60 mg/ml of one quarter diluted saline has been found to be optimal for the most efficacious delivery. Although in some instances both lower or higher doses, typically from 40–80 mg/ml may be advantageously used, the 60 mg/ml dose of tobramycin is preferred. A more concentrated tobramycin solution has three disadvantages. First, if the solution approaches the solubility of tobramycin, 160 mg/ml, precipitation on storage is expected. Second, a higher concentration of tobramycin than is clinically needed is economically disadvantageous. Thirdly, a more concentrated solution will increase the osmorality of the solution, thus decreasing the output of the formulation with both jet and ultrasonic nebulizers. The alternative of a more concentrated solution in a smaller total volume is also disadvantageous. Most nebulizers have a dead space volume of 1 ml, i.e., that of the last 1 ml of solution is wasted because the nebulizer is not performing. Therefore, while for example, a 2 ml solution would have 50% wastage, the 5 ml solution (the capacity of the nebulizer) has only 20% wastage. Additionally, since there is no sufficient aerosolization of the drug into the small particles, the drug in large particles or as a solution is deposited in the upper airways and induces cough and may also cause bronchospasm. Large aerosol particles also limit the drug delivery.
>
> *The dose lower than 60 mg of tobramycin of diluted saline is not sufficient to suppress the bacterium and to treat the infection. Lower concentrations of tobramycin will not be sufficiently effective in at least 90% of patients.* This is due to variability of sputum tobramycin levels caused by anatomical variability among patients as observed in Examples 4 and 5, and also because the minimum inhibitory concentration of *Pseudomonas aeruginosa* also varies. As seen in Table 4, a dose of 300 mg total has been found to be optimal. Previously studied doses 80 mg, *Pedia Pulmonol.*, 6:91–8 (1989) were reported effective, however, the dose would be predicted to be efficacious in approximately sixty to seventy percent of patients initially. If any degree of drug resistance developed, only a small percentage of patients would be effectively treated.

Plaintiff argues that this was not sufficient to disclaim tobramycin concentrations of less than 60 mg/ml. Plaintiff emphasizes the language that "in some instances both lower or higher doses, typically from 40–80 mg/ml may be advantageously used." ('269 patent, col. 8, lines 3–4).

The remainder of the above quoted language, though, seems to be a critique of formulations less than 60 mg/ml and above 200 mg/ml. The patent described the 60mg/ml

7

concentration as the formulation "which is minimal yet efficacious," "optimal," and "preferred." Lower concentrations were deemed "not sufficient to suppress the bacterium and to treat the infection"and "will not be sufficiently effective in at least 90% of patients."

This critique is similar to that found to estop the patentee in *SciMed*, *supra*. That opinion explained that the patentee:

> As noted above, the common specification of SciMed's patents referred to prior art catheters, identified them as using the dual lumen configuration, and criticized them as suffering from the disadvantages of having "larger than necessary shaft sizes" and being "stiffer in their distal regions than would be desired." That criticism of the dual lumen configuration was consistent with the evidence from SciMed witnesses and documents, which noted the advantages of the coaxial lumen configuration in increasing the flexibility of catheters and their ability to track through the coronary arterial system. The disclaimer of dual lumens was made even more explicit in the portion of the written description in which the patentee identified coaxial lumens as the configuration used in "all embodiments of the present invention.

*SciMed*, 242 F.3d at 1345 (internal citations omitted). In *SciMed*, just as in the instant case, the patentee did not state that the dual lumen configuration was completely useless, but did describe in detail the disadvantages of that alternative configuration. Accordingly, the opinion ruled that "[h]aving specifically identified, criticized, and disclaimed the dual lumen configuration, the patentee cannot now invoke the doctrine of equivalents to 'embrace a structure that was specifically excluded from the claims.'" *Ibid*. (*quoting Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir.1994)).[3]

Likewise, a similar result was reached in *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1016 (Fed. Cir. 1998). The Federal Circuit there overturned a jury verdict finding infringement under the doctrine of equivalents. The opinion explained that:

> The patent teaches that such mechanisms are time-consuming to adjust and are prone to misadjustment by inserting the pin in the wrong holes, and furthermore the loose pins in such mechanisms are easily lost. Kentucky Farms' multiple-hole, pinned height-adjustment mechanism is such a mechanism and shares these same problems.

---

[3] It is also worth noting that, in order to estop reliance on the doctrine of equivalents, the disclaimer need not be in response to an action by the United States Patent Office. While defendants have not pointed to any aspect of the prosecution history of the '269 patent suggesting office action, neither was such a fact suggested in *SciMed*.

8

*Ibid*. (internal citations omitted). Accordingly, "[t]hese statements in the patent alone strongly suggest, if not mandate, judgment in Kentucky Farms' favor."

Nevertheless, at hearing on the instant motions, plaintiff presented persuasive authority that simply critiquing the prior art in the context of a later patent is not sufficient to clearly disavow those claims in the later patent. In *Micro Chemical v. Great Plains Chemical Co.*, 194 F.3d 1250, 1260 (Fed. Cir. 1999), the Federal Circuit ruled that inclusion of a prior art reference that contained certain limitations could not be translated as a disclaimer for purposes of the later patent. The decision stated:

> [T]he district court read the patentee's statements about the Brewster prior art as a clear disavowal of the weigh dump method. To the contrary, although the applicant noted certain inefficiencies in the Brewster system, the patent never clearly disavows the weigh dump method as being incapable of performing the claimed functions. The statements relied on by the district court in both the background section and the prosecution history were directed to a particular prior art device, the Brewster machine, not to the weigh dump method in general .
> . . .
>
> \*      \*      \*
>
> The prosecution history also does not disavow the weigh dump method. The prosecution history merely described the Brewster system to facilitate a comparison by the patent examiner.

Accordingly, plaintiff argues that the purported disclaimers in the '269 patent are irrelevant because that patent involved a "*low* efficiency nebulizer and not the *high* efficiency eFlow® device used by Defendants and covered by the patent in suit" (Opp. 4) (emphasis in original). The disclaimers in the earlier patent were reflective of the limitations of nebulization at the time of that patent. The '907 patent purportedly advanced on that prior art by utilization of high efficiency nebulization and so, it is argued, the critiques must be read in that light.

As with the issue of total volume versus concentration, this is an issue that will benefit from the trial process. This order allows plaintiff to present evidence on the theory of doctrine of equivalents, but defendants may challenge that theory again on a Rule 50 motion.

9

United States District Court
For the Northern District of California

**CONCLUSION**

For the foregoing reasons, defendants' first and second motions *in limine* are **DENIED WITHOUT PREJUDICE** to defendants to raise these arguments again in a motion under FRCP 50.

**IT IS SO ORDERED.**

Dated: April 4, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10