Howard A. Janssen (State Bar No. 045385)
Richard P. Doyle, Jr. (State Bar No. 112459)
JANSSEN DOYLE, LLP
2540 Camino Diablo, Suite 220
Walnut Creek, CA  94597
Telephone:      (925) 295-1805
Facsimile:       (925) 295-1801

**Attorney for Defendants**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHIRON CORPORATION, a Delaware corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>SOURCECF, INC.; SOURCECF CLINICAL RESEARCH & DEVELOPMENT, L.L.C.; MAXOR NATIONAL PHARMACY SERVICES CORPORATION d/b/a IV SOLUTIONS; FOUNDATION CARE L.L.C.; and PHARMACEUTICAL SPECIALTIES, INC.,<br><br>    Defendants. | Civil Action No: C 05-01938 WHA<br><br>**DEFENDANTS' POST-TRIAL BRIEF** |

**I. INTRODUCTION**

At trial, the Court asked Chiron the same question the Defendants asked when they were sued without warning on May 10, 2005, the day the '907 patent issued: What is the invention of the '907 patent?

The Pharmacy Defendants are pharmacists -- licensed, trained, and skilled in the art of formulating, compounding, and dispensing drugs to fill a doctor's prescription. They recognized that the patent set out a method of treating certain lung infections with tobramycin in a nebulizer. They were familiar with formulating the NEBCIN brand of tobramycin for use in nebulizers, dating back to 1991. Also, the Pharmacy Defendants had filled prescriptions for a concentration of 100 mg/ml of tobramycin well before the issuance of the '907 patent.

The claims define the invention as nebulizing tobramycin according to certain physical and operational parameters. Even though the '907 patent was developed using the Aerodose nebulizer, we now learn from one of the inventors that its parameters were intended to cover all new nebulizers. The claims also set forth certain physical parameters for the formulation to be nebulized. One of those physical characteristics is a concentration range of tobramycin in solution.

In defining their invention, the inventors of the '907 patent explained a method of treatment that might improve patient compliance. Their invention was directed to children who were not taking all their antibiotics by nebulizing, because doing so just took too long. During the trial, we learned what a problem patient compliance is for children with cystic fibrosis. There are approximately 15,000 cystic fibrosis patients with chronic lung infections that require antibiotic treatment. Of that number, 10,000 are on TOBI and the other 5,000 are either non-compliant, or on alternative therapies. The non-compliance of patients with chronic lung infections leads to irreversible loss of lung capacity. Witnesses confirmed the seriousness of these lung infections, as did Chiron in letters to the FDA put into evidence. It is this loss of lung capacity that can lead to early death.

The Pharmacy Defendants well understood the issue of compliance. They were aware of the critical impact of reduced nebulization time for a child who has to nebulize twice a day, often

JANSSEN DOYLE, LLP

for hours with a variety of medications. Responding to this concern, the Pharmacy Defendants had already been distributing the eFlow nebulizer with a 100mg/ml concentration of tobramycin. This shortened nebulization time for these children from 20 minutes to about 4 minutes. So these men knew the problem well, and had worked on solving it.

Dr. Challoner explained the background (the prior art) of Chiron's interest in this area. Dr. Challoner testified that the '269 patent, now owned by Chiron, was directed to TOBI. We learned that sales of TOBI in its first year, 1997, were $60,000,000. Dr. Challoner shared with us that the invention of the '907 patent was to get the remaining non-compliant patients (i.e., the remaining 5,000 patients) onto TOBI therapy, owned by Chiron. For these reasons, the '907 patent talks about improving compliance, by utilizing lower volumes of liquid (than TOBI at 5 ml), and higher concentrations (than TOBI at 60 mg/ml).

The problem that led to the invention was a need to decrease the nebulization time: to do this, you need a better nebulizer (the Aerodose), or you need a more concentrated solution of tobramycin than TOBI. That explains why <u>not a single test</u> by the inventors was of a concentration of tobramycin less than TOBI (that is, less than 60mg/ml). That would not have addressed the problem the inventors were trying to solve.

This also explains why the inventors incorporated by reference the '269 patent. The '269 patent, owned by Chiron, covers TOBI. Since 1997, TOBI has always been at a concentration of 60 mg/ml, no more and no less. The inventors of the '269 patent set forth in the patent that a concentration below 60 mg/ml would not work to treat a lung infection.

This background to the '907 patent, in evidence, allows us to understand how the Pharmacy Defendants read the '907 patent as persons of skill in the art. They were familiar with TOBI and its inherent delivery issues. The invention was a more concentrated form of tobramycin than TOBI, in less liquid than TOBI, and to be nebulized according to the operational parameters of the Aerodose nebulizer. Defendants submit that they were, and are, entitled to rely on this explanation of the invention, and on these limitations which the inventors selected to define their invention.

Trusting they understood the invention as explained and claimed in the '907 patent, the

Defendants contacted this court and asked for help in late 2005, when this matter could not be resolved. Even though they had doubts about the patent's validity, and doubts whether there was infringement even at 100 mg/ml, they knew that they could not afford a lengthy legal battle against Chiron, with Chiron's sales of TOBI funding the lawsuit.

So the Defendants made an unprecedented decision, and voluntarily asked the Court for entry of an injunction against themselves. The Pharmacy Defendants represented to the Court that they would stop filling prescriptions at 100mg/ml. They informed the Court they intended to continue to fill prescriptions well outside the range of the concentration in claim 1, by going to a concentration of 50mg/ml.

With those changes, the nebulization time is now 8-10 minutes, compared to 4 minutes, and concerns of compliance remain. So the lives and well being of children remain at stake. This problem is heightened because Chiron has no treatment implementing the '907 patent available for physicians, and the reality is that the Aerodose nebulizer does not work.[1]

Dr. Challoner testified that even if the Aerodose nebulizer worked, Chiron would not make this treatment available to patients without FDA approval. But there was some very troubling testimony on this topic at trial: Chiron has taken <u>no steps</u> to obtain that approval, even though it has taken the position that the claims apply to nebulizers other than the Aerodose. That leaves a reasonable inference that Chiron never intended to provide this treatment to patients by marketing a product that incorporates its technology; and that Chiron obtained this patent to preclude someone else from marketing a better treatment that might adversely impact sales of TOBI. These inferences are reasonable, yet shocking in light of the representations Chiron itself has made to the FDA -- that treating chronic lung infections is so important that it can be a deciding factor in whether a child with cystic fibrosis lives.

Chiron developed the '907 patent to fill the void for patients that, it believed, could otherwise be taking TOBI. It wants cystic fibrosis patients to have access only to its almost 10-

---

[1] While Chiron did obtain an order in limine precluding evidence that no product was available incorporating the invention of the '907 patent, Chiron has waived this preclusion, and reasonable inferences there from, by placing <u>this very fact</u> into evidence on direct examination (see Challoner RT 40:7-10): "Q. … has FDA approved a product based on the '907 patent? A. … No, currently there is no FDA-approved product, based on the '907 patent."

No. C 05-01938 WHA                            3

DEFENDANTS' POST-TRIAL BRIEF

year-old TOBI product, which it touts as the "only FDA approved drug/device combination."

That leads again to the question, what is the invention? If the invention is not what is set forth in the claims, and if the Pharmacy Defendants cannot rely on the language of the claims in defining the invention, then what is it? The real issue at trial has not been literal infringement, as the 50 mg/ml concentration is clearly outside the literal range of about 60 mg/ml to about 200 mg/ml. Such a conclusion is based on a basic understanding of the value of numbers. The 40 mg/ml concentration is not even accused of literal infringement. Instead, Chiron's focus has been, as to both formulations, on theories of infringement under the doctrine of equivalents. It is there that we now focus our analysis of the legal issues to be decided by this Court.

## II.   THE EQUITIES OF APPLICATION OF THE DOCTRINE OF EQUIVALENTS

The Federal Circuit has stated: "[T]he doctrine of equivalents is an equitable doctrine." Tate Access Floors, Inc. v. Interface Architectural Resources, Inc., 279 F.3d 1357, 1367 (Fed. Cir. 2002). Typically, what the court is trying to decide in these cases is the scope of what was invented. Here that leads to this inquiry: did Dr. Challoner invent a faster, better method of treating lung infections with a concentration of 50 mg/ml or lower, <u>even though</u>: (1) the claims start at "about 60 mg/ml", go to 80 mg/ml, and then, most preferably, go to 90 mg/ml; (2) no concentration below 60 mg/ml was ever tested; and (3) such concentrations were disavowed as being part of the invention. In light of the record, and in light of the factual background set out above (relevant to this equitable determination), it is simply inappropriate for Chiron to claim that Dr. Challoner invented a method of treatment that includes a concentration of tobramycin at 50 mg/ml and below.

It is really shameful that, under the guise of proving infringement under the doctrine of equivalents, Chiron has presented experts to testify that Dr. Challoner invented a method of treatment that encompasses <u>virtually any amount</u> of tobramycin. That was the testimony of Dr. Smaldone, discussed at length in Defendants' various briefings. It is simply not true.

JANSSEN DOYLE, LLP

**III. RESPONDING TO THE COURT'S QUERY CONCERNING DEFENDANTS' EFFORTS TO CREATE A "RESPIRABLE DOSE EQUIVALENT TO TOBI"**

At RT 590:19-591:2, the Court stated, referring to Defendants, emphasis added:

> *You want to have it both ways. You have people going out there in the marketplace saying, "this is **equivalent to TOBI**, except faster, and **we're going to give you a dose that's equivalent to a hundred, and we'll just go down to 40 and 50**," and they got you red-handed, saying that, at various places. So why shouldn't you just be held to what you were saying out in the marketplace.*

Defendants respectfully submit that their activities, even as described in these unflattering terms by the Court, in no way constitute or encompass infringement of the '907 patent. Certain terms from the Court's quotation have been highlighted for discussion below.

First, the '907 patent is not TOBI: it was intended to improve on TOBI which is the invention of the '269 patent, not the '907 patent. Challoner at RT 62:23-25.

Second, the '907 patent talks about the "nebulized unit dose", which is the operative phrase from Claim 1. The '907 patent does not define the invention by what is a "respirable dose" of tobramycin. Chiron's expert explained that "respirable dose" is different from "unit dose". Smaldone at RT 120:4-16. Dr. Challoner and Mr. Sledge concur as well. Challoner at RT 49:8-12; Sledge Ex. 205, at 96:13-97:5. Thus, "respirable dose" – at the heart of Chiron's contentions – is <u>not</u> an element of Claim 1. See Ex. 95, column 63, lines 23-31; see also Fact 87.

With that in mind, that Defendants requested testing by UNC, in order to ascertain the "respirable dose" of solutions of concentrations not covered by the '907 patent, does not mitigate towards a finding of infringement. Ex. 72. Putting it another way, this is not conduct for which the Defendants could be caught, using the Court's term, "red-handed". Instead, what the Defendants are doing is fair, competitive, and socially beneficial commercial and scientific work, intended to provide additional data to doctors. Ex. 72a.

Third, Exhibit 6, which includes the mathematical formula cited by the Court, and was the lead document cited by Chiron in closing argument, makes no mention of the methodology of claim 1 of the '907 patent. Instead, it compares a tobramycin 170 mg formulation with TOBI at

JANSSEN DOYLE, LLP

300 mg of tobramycin. Sledge, Ex. 205 at 133:10-17. <u>The '907 patent does not claim TOBI.</u>

What Chiron has done is to try to substitute the phrase "respirable dose" for the claim language "nebulized unit dose"; and then attempt to use "respirable dose" to vitiate the <u>concentration</u> of tobramycin set forth in claim 1. Chiron cannot so rewrite the claim. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

Once again Defendants raise the question: What then is the invention? The Court succinctly put the same issue to Chiron (RT 573:18-22): "You can't just read that limitation [concentration] out." Defendants point out again that so long as one does not read that limitation "out", there is no infringement. Nor is anything that the Defendants are doing (e.g., Defendants' Facts 88-95) commercially improper.

The Court clearly grasped the "slippery slope" of this issue when it stated (RT 576:16-19): "For all we know, they'll come out with nebulizers that can do it at 20 ml -- 20 mg, and do it in 9.9 minutes, and you would say it was covered, because it was effective."

The Court's comment goes to the heart of the issues. What did Dr. Challoner invent? See Defendants' Facts #124-127. Dr. Challoner testified that a person of ordinary skill in the art prior to the invention of the '907 patent would have combined TOBI in a high efficiency nebulizer, and that he was aware of high-efficiency nebulizers such as the eFlow prior to working on the invention of the '907 patent. But Chiron at trial, contrary to the prosecution history, to the workings of the patent, and to the scope of the claims, now represents that Dr. Challoner invented the use of what amounts to <u>any</u> amount of tobramycin in <u>any</u> new nebulizer.

So there really is no invention here, and it is proper for this Court to so hold. See <u>Doughboy Industries, Inc. v. Goff</u>, 110 F.Supp. 358, 364 (D. Minn. 1953): "Ordinarily, as guardian of the public interest in patents, the Court should, of its own motion, consider the question of validity." (there citing <u>Sinclair & Carroll Co., Inc. v. Interchimical Corporation</u>, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644). In fact, by so holding this Court would allow cystic fibrosis patients to have the benefit of the latest technology in the treatment of their disease,

by obtaining prescriptions for solutions of 100mg/ml.

In any event, it would not be an equitable result to give Chiron the scope of inventions it currently seeks, in light of the language and the prosecution history of the '907 patent. Chiron neither invented tobramycin nor a nebulizer. As to the '907 patent, Chiron has not shown that Dr. Challoner invented a method of treatment of lung infections with concentrations of 50mg/ml or tobramycin and lower.

## IV. DOCTRINE OF EQUIVALENTS: THE INVENTORS' VOLUNTARY SURRENDER OF CLAIM 27 CONSTITUTES PROSECUTION HISTORY ESTOPPEL AS TO CHIRON'S "TOTAL DOSE" THEORIES

The Court is well aware of Chiron's emphasis on "total dose" throughout this trial. Defendants have pointed out again and again that "concentration," not "total dose", is the relevant limitation of the claims of the '907 patent.

Defendants' position is buttressed, and should prevail, based upon the prosecution history of the '907 patent. A review of Exhibit 96, pages C-000139-000142 and C-000151-000154 (Defendants' Facts 69-70) reveals the following. At page C-000154 of Exhibit 96, Chiron amended its patent application to include a proposed Claim 27: "A method of Claim 1 wherein at least 20 mg of tobramycin is administered to a patient." ***This was a "total dose" claim.***

But Claim 27 was voluntarily withdrawn by the inventors after a phone call with the patent examiner. See Examiner's Amendment (Ex. 96, page C-000140), noting that by phone authorization the Examiner was to: "Cancel claims … 27-28 without prejudice."

This voluntary amendment *to withdraw the only "total dose" claim submitted* for the '907 patent gives rise to the doctrine of prosecution history estoppel. See <u>Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.</u>, 370 F.3d 1131, 1139 (Fed. Cir. 2004) [" … prosecution history estoppel may bar the patentee from asserting equivalents if the scope of the claims has been narrowed by amendment during prosecution."] Most significantly applicable here, see <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, Ltd., 344 F.3d 1359, 1366 (Fed. Cir. 2003) ["We next reinstate our holding that a "voluntary" amendment may give rise to prosecution history estoppel."]

No. C 05-01938 WHA                                                7

Defendants respectfully submit that the "total dose" theory has never made sense because (like Chiron's theory that the case is only about the time of nebulization) it inappropriately *reads out the concentration limitation* of the '907 patent's claims. For purposes of the doctrine of equivalents, the prosecution history of Claim 27 should put to rest any assertions that the equivalents available encompass some calculation based upon "total dose". When the inventors withdrew the only "total dose" claim, prosecution history estoppel barred this theory of equivalents.

## V. DOCTRINE OF EQUIVALENTS: REVISITING "SPECIFICATION DISCLAIMER ESTOPPEL" AS A BAR TO ASSERTING INFRINGEMENT BY THE ACCUSED FORMULATIONS

One subject matter of Defendants' motions in limine (Motion #2) and Rule 52(c) motions has been estoppel, based on incorporating by reference the '269 patent into the '907 patent. (*cf.,* April 4 Order, p. 6:20-21). The '269 patent disavows the efficacy of concentration of tobramycin in solution below 60 mg/ml, so this is an important issue. In its April 4 Order, the Court noted, and deferred, the remaining question: " … whether the '269 patent clearly disclaimed equivalent products containing concentrations of tobramycin of less than 60 mg/ml."

The Court then went on to note (April 4 Order, p. 8:4-5) that: "The critique [found here] is similar to that found to estop the patentee in SciMed." [Referring to SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc., 242 F.3d 1337 (Fed. Cir. 2001).] Before ultimately noting that this question would "benefit from the trial process," the Court discussed Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250 (Fed. Cir. 1999).

Defendants would now like to address that case on this issue. In Micro Chemical, the Federal Circuit reversed a District Court finding of disavowal by the specification. But the facts of that case are readily distinguishable. There, the appellate opinion concluded that the District Court had erred because the patentee's discussion in the background and prosecution history: " … merely described the (prior art) Brewster system to facilitate a comparison by the patent examiner. The description of the Brewster machine pointed out numerous features which were

1  distinguishable from the preferred embodiment of the invention." 194 F.3d at p. 1260.

2  The court went on to note that, in distinguishing the prior art in this way, the inventors
3  had: "noted certain inefficiencies in the Brewster system"; but, most significantly, the patent's
4  text had never clearly disavowed the accused infringer's weigh dump method: "as being
5  incapable of performing the claimed functions." Id.

6  The dispositive inquiry in Micro Chemical was, therefore, whether the patentee had or had
7  not disavowed one particular method. Under the facts there, the Federal Circuit on review found
8  that the patentee had not.

9  But here, the '907 patent's inventors chose to incorporate Chiron's '269 patent's in its
10 entirety, and that included the specific disavowal of concentrations below 60 mg/ml contained
11 therein. Having done so, inclusion of the '269 text's language in the '907 patent's specification is
12 the legal consequence.

13 In SciMed, 242 F.3d at p. 1347, which all have acknowledged is the lead authority on this
14 issue, the Federal Circuit concluded that the patentee simply had a choice before him, made it,
15 and bore the consequences thereof:

16 … the patentee had an opportunity to draft the patent in a way that would make
17 clear that dual lumens as well as coaxial lumens were within the scope of the
18 invention, but the patentee did just the opposite, leaving competitors and the public
19 to draw the reasonable conclusion that the patentee was not seeking patent
20 protection for catheters that used a dual lumen configuration. Under these
21 circumstances, the district court was justified in concluding that a reasonable jury
22 could not find that the accused devices infringe the SciMed patents under the
23 doctrine of equivalents.

24 The situation here is exactly the same. Simply stated, Chiron had an opportunity to draft
25 the patent in a manner which would <u>not</u> incorporate the '269's disavowal of these concentrations.
26 Moreover, the '907 inventors could have in a more limited manner incorporated by reference the
27 '269 patent, making a specific reference that the incorporation was limited to the teachings
28 concerning the then existing generation of nebulizers, and not to the more efficient nebulizers

No. C 05-01938 WHA                               9

available by the time the '907 patent was drafted. See Defendants' Facts 70-76.

But, instead the inventors chose to incorporate the '269 patent in its entirety. That means that the disavowals of the '269 patent are part of the '907 patent. On this point, Defendants request that the Court particularly note authority not previously cited, Aquatex Industries, Inc. v. Techniche Solutions, 419 F.3d 1374, 1381 (Fed. Cir. 2005): "Because AquaTex chose to incorporate by reference the teachings of three United States Patents to define the scope of the term "fiberfill", these publications are highly relevant to one of ordinary skill in the art for ascertaining the breadth of the claim term." Like the inventors in SciMed, the '907 inventors made a choice and must bear the consequences of their choice.

Again, Defendants return to the question: What is the invention? In the context of this issue, the question becomes: should the Court find that Dr. Challoner invented a method of treating lung infections at concentrations below 60 mg/ml, when the inventors (by their incorporation by reference) had disavowed concentrations of tobramycin below 60 mg/ml as lacking efficacy? *Cf.,* April 4 Order, 8:4-5, quoted above. Defendants respectfully submit that these concentrations cannot be considered to be part of the invention, and cannot now be claimed as equivalents, under these applicable legal principles.

## VI. ADDITIONAL CITATIONS FROM CHIRON DOCUMENTS ON THE ISSUE OF DOCTRINE OF EQUIVALENTS

If the Court gets to the merits of infringement under the doctrine of equivalents in spite of the estoppel arguments raised above, the heart of the issue is whether the solutions of the accused formulations are interchangeable, and insubstantially changed, from the solution in the patent claims.

The solutions are certainly not identical. They need to be made unique to each concentration of tobramycin. What has Chiron itself said, in another context, about whether such solutions are interchangeable or insubstantially different?

***Chiron itself*** stated in a letter to the FDA: "In conjunction with the performance of a specific nebulizer, *small changes in formulation parameters such as osmolality, pH, and inactive ingredients are likely to produce changes in the delivery pattern* and therefore have the potential

1  to impact the safety and efficacy of inhaled drug products." Ex. 216, page JD-0504, second full
2  paragraph, lines 23-26 (emphasis added).

3  *Chiron itself* also stated in that letter to the FDA: "Any changes in strength, volume to be
4  administered and formulation would require clinical studies to assure that the systemic exposure
5  of either of the accused drug products are less than or equal to that seen with the TOBI
6  formulation." Ex. 216, page JD-0503, second full paragraph, lines 18-21.

7  Chiron's scientists would certainly not have formed these opinions if these were only
8  "insubstantial changes", or if the solutions were just "interchangeable." But now Chiron takes the
9  opposite position. See its proposed Fact 2.9: "Defendants made insubstantial changes to the
10  characteristics -- such as salinity, osmolality and pH -- of their tobramycin solutions for use with
11  eFlow® when they changed their formulations from 100 mg/ml to 50 mg/ml and 40 mg/ml."

12  Defendants respectfully submit that only now, trying to be consistent with its litigation
13  position, does Chiron take what is essentially the opposite position to what it took before the
14  FDA. But Chiron's stated opinions in the FDA letter, expressed in a non-litigation situation, are
15  far more likely to be credible; and those statements are supportive of Defendants' position here.

16  Chiron's trial "spin" is outweighed by more than just what Chiron has said before. There
17  is other evidence that Defendants' formulations for their 50 mg/ml and 40 mg/ml concentrations
18  are not interchangeable with the formulations called for in the '907 patent. The solutions with a
19  tobramycin concentration of 50 mg/ml and 40 mg/ml have different osmolality, salinity, surface
20  tension, and viscosity than a solution with a tobramycin concentration of 100 mg/ml. Birdsong at
21  RT 492:1-9, 492:20-493:3, 493:25-494:11; Ex. 5; See also Ex. 215 and Ex. 216. The different
22  solutions result in different nebulization times that affect the method of treatment and compliance
23  with that method of treatment. Schultz, Ex. 210 at 196:5-7, 196:17-197:11, 224:10-15, 224:19-
24  226:8; Birdsong at RT 493:4-15. See also Defendants' proposed Findings of Fact, Facts 26-36;
25  and 101-111.

**CONCLUSION**

26  Returning to where this briefing started, what did Dr. Challoner invent? He has not
27  proven a scope of his invention that should cause this Court, legally or equitably, to expand the
28

clear wording of the claims of the '907 patent to encompass a method of treatment that uses a concentration of 50mg/ml of tobramycin in solution. To so hold would be contrary to the prosecution history; contrary to the language of the claims; and contrary to the intentions and teachings of what the '907 patent added to TOBI, the then current method of treatment. Dr. Challoner and his co-inventors did not invent the use of what amounts to <u>any</u> amount of tobramycin in <u>any</u> new nebulizer.

Defendants submit that they understood the purpose underlying the '907 patent and the invention of the '907 patent, as persons of ordinary skill, properly and in good faith; and the record shows that they took reasonable steps to validate their understanding.

There are a myriad of failures in Chiron's proof as to infringement, and several legal defenses applicable here as well (lack of direct infringement, specification disclaimer estoppel, prosecution history estoppel, the "all limitations rule", etc.). But the heart of the case is really what the Court stated (RT 573:18-22): "You can't just read that limitation [concentration] out."

In an effort to prevail here, Chiron is trying to do just that; and it is legally wrong and morally repugnant to do so. There is no colorable argument for literal infringement. Moreover, the doctrine of equivalents is an equitable doctrine which has no bearing under the facts here – among other things, it cannot be used to read out (vitiate) a claim element.

Defendants respectfully submit that Chiron's claims for patent infringement should be denied; such a determination would then permit Defendants to seek relief pursuant to their reserved claim for attorneys' fees.

Respectfully submitted,

By: _____:/s/_____
Richard P. Doyle, Jr.
Attorney for Defendants

No. C 05-01938 WHA   12

DEFENDANTS' POST-TRIAL BRIEF