Gerald Sobel
Benjamin Hsing (*Pro Hac Vice*)
Jeffrey Horowitz (*Pro Hac Vice*)
Sumir Sennik (*Pro Hac Vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York  10022-3598
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8686

Mark D. Petersen (State Bar No. 111956)
Nan E. Joesten (State Bar No. 191288)
Lucas Huizar (State Bar No. 227111)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

Attorneys for Plaintiff
CHIRON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHIRON CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>SOURCECF, INC.; SOURCECF CLINICAL RESEARCH & DEVELOPMENT, L.L.C.; MAXOR NATIONAL PHARMACY SERVICES CORPORATION d/b/a IV SOLUTIONS; FOUNDATION CARE L.L.C.; and PHARMACEUTICAL SPECIALTIES, INC.,<br><br>Defendants. | Case No.  C 05-01938 WHA<br><br>**PLAINTIFF'S POST-TRIAL BRIEF**<br><br>Dept.:     Courtroom 9, 19th Floor<br><br>Honorable William H. Alsup |

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

19796\940429.1

1

# TABLE OF CONTENTS

2

3

I.     INTRODUCTION ............................................................................................. 1

II.    THE INVENTION EMBODIED IN THE '907 PATENT ................................. 1

III.   DEFENDANTS' INFRINGE THE '907 PATENT ........................................... 2

      A.    Literal Infringement (50 mg/ml) ....................................................... 2

      B.    Doctrine Of Equivalents (50 mg/ml and 40 mg/ml) .......................... 4

            1.    The '269 Patent Does Not Disclaim Equivalents........................ 6

            2.    Prior Art Does Not Limit The Scope Of Equivalents ................. 7

            3.    Prosecution History Estoppel Does Not Apply........................... 9

            4.    FDA Standards For Safety And Efficacy Are Distinct From Patent Equivalence ............................................................... 10

IV.   CONCLUSION.............................................................................................. 12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

19796\940429.1

1

## **TABLE OF AUTHORITIES**

2

### **FEDERAL CASES**

3

4

*Abbott Laboratories v. Dey L.P.*,
   287 F.3d 1097 (Fed. Cir. 2002).......................................................................... 8

5

*Advanced Display System, Inc. v. Kent State University*,
   212 F.3d 1272 (Fed. Cir. 2000).......................................................................... 8

6

7

*Astrazeneca AB v. Mutual Pharm. Co.*,
   384 F.3d 1333 (Fed. Cir. 2004).......................................................................... 6

8

*Festo Corp.*,
   535 U.S. at 737-38 ........................................................................................... 10

9

10

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   234 F.3d 558 (Fed. Cir. 2000)............................................................................ 4

11

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001)............................................................................ 4

12

13

*Leggett & Platt, Inc. v. Hickory Springs Manufacturing Co.*,
   285 F.3d 1353 (Fed. Cir. 2002)............................................................................ 4

14

*Micro Chemical v. Great Plains Chemical Co.*,
   194 F.3d 1250 (Fed. Cir. 1999)............................................................................ 7

15

16

*Modine Manufacturing Co. v. U.S. International Trade Commission*,
   75 F.3d 1545 (Fed. Cir. 1996)............................................................................ 2

17

*SciMed Life System, Inc. v. Advanced Cardiovascular System, Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001)...................................................................... 6, 7

18

19

*Scott v. Finney*,
   34 F.3d 1058 (Fed. Cir. 1994)..................................................................... 10, 11

20

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*,
   279 F.3d 1357 (Fed. Cir. 2002)............................................................................ 3

21

22

*Toro Co. v. White Consolidated Industrial, Inc.*,
   266 F.3d 1367 (Fed. Cir. 2001)............................................................................ 4

23

*Warner-Jenkinson, Co. v. Hilton Davis Chemical Co.*,
   520 U.S. 17 (1997)...................................................................................... 4, 8

24

### **FEDERAL STATUTES**

25

U.S.C. § 103(a) (1994)................................................................................................. 8

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

- ii -

19796\940429.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    **INTRODUCTION**

This is a case about deliberate infringement, and a classic example of equivalence.  The primary issue is whether the use of Defendants' 40 mg/ml or 50 mg/ml tobramycin solution with the eFlow® nebulizer infringes the "about 60 to about 200 mg/ml" limitation of U.S. Patent No. 6,890,907 (the "'907 patent").  Defendants have admitted that the remaining limitations of claim 1 are met.

Rather than repeat once again the infringement arguments previously briefed in prior filings (*i.e.*, Chiron's pretrial Trial Brief, Chiron's Opposition to Defendants' Rule 52 Motion) and reiterated in Chiron's Proposed Findings of Fact and Conclusions of Law (and in Chiron's Response to Defendants' Proposed Findings of Fact and Conclusions of Law) Chiron will instead use this opportunity to address particular issues raised by the Court during the course of the trial of this matter.

## II.    **THE INVENTION EMBODIED IN THE '907 PATENT**

Dr. Challoner, an inventor of the '907 patent, described his novel invention as a *method* of treating endobronchial (lung) infections through the use of an inhaled tobramycin formulation with a high efficiency nebulizer, which results in a nebulization time of ten minutes.  Challoner at RT 38:23-39:20, 528:10-22.  The PTO Notice of Allowability, signed by three examiners, including two supervisory examiners, expressly sets forth "[t]he novel features of this invention" and states that "[s]uch novel features are neither taught nor anticipated by the prior art."  Challoner at RT 529:8-531:10; Tr. Ex. 96.  As Dr. Smaldone, a physician and expert in aerosol delivery of medications explained, a physician cannot simply take a new high efficiency nebulizer (such as the eFlow or AeroDose) and determine the appropriate formulation with which to treat a patient.  Smaldone at RT 131:13-22.  Performing the necessary studies to ascertain the appropriate formulation to use with the device is "essentially the invention" — "it's putting the device together with the formulation to provide certain new types of therapy."  Smaldone at RT 131:23-132:5.

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

19796\940429.1

**III.    DEFENDANTS' INFRINGE THE '907 PATENT**

At the time the '907 patent issued, Defendants were filling prescriptions for tobramycin solutions for use with the eFlow nebulizer at a concentration of 100 mg/ml. *See* Chiron's Proposed Fact ("CPF") 2.3.  Defendants acknowledged that their 100 mg/ml formulations, compounded solely for use with the eFlow, literally met every element of at least claim 1 of the '907 patent. *See id*. at 2.1.  Rather than discontinue their infringing activities, however, two of the compounding pharmacies, Foundation Care and IV Solutions, continued to fill prescriptions for 100 mg/ml; in contrast, PSI immediately stopped. *See id*. at 10.1; Defendants' Proposed Fact 117.

Five months after issuance of the patent, and in anticipation of the imminent permanent injunction, all three compounding pharmacies made a trivial and insubstantial modification to their 100 mg/ml tobramycin formulations. *See* CPF 2.9.  Without changing the total dose of medication, and without performing any supporting studies, Defendants reduced the concentration of tobramycin in their formulations from 100 mg/ml to 50 mg/ml and 40 mg/ml. *See id*. at 2.4, 2.6, 7.8 and 7.9.  In order to ensure maintenance of the same total dose of tobramycin, Defendants simply increased the volume of the saline solution and reduced the amount of tobramycin. *See id*. at 2.5, 2.7 and 2.9.  In the context of the '907 patent, this change is insubstantial, and one of ordinary skill in the art would understand that Defendants' 50 mg/ml and 40 mg/ml formulations are not in any meaningful way different than their admittedly infringing 100 mg/ml formulations; in fact, they are interchangeable. *See id*. at 4.4 and 5.12-5.16.

**A.    Literal Infringement (50 mg/ml)**

The Court has construed "about 60 to about 200 mg/ml" to mean "approximately 60 to approximately 200 mg/ml." *See* Order Granting Permanent Injunction, dated December 1, 2005.  To determine whether Defendants' 50 mg/ml formulations fall within the literal scope of this limitation, the Court must look at the underlying technology of the invention. *See Modine Mfg. Co. v. U.S. International Trade Comm'n*., 75 F.3d 1545, 1554 (Fed. Cir. 1996) ("[I]t is a question of technologic fact whether the accused device meets a reasonable meaning of 'about' in the particular circumstances.")

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

- 2 -

19796\940429.1

1    Dr. Smaldone and Dr. Finlay (also a highly credentialed expert in the aerosol delivery of

2    medications) explained that the technology of the '907 patent compels consideration of the

3    resulting respirable dose and air surface liquid concentration in the endobronchial region.  *See*

4    CPF at 4.3.  Dr. Finlay testified that administration of Defendants' 50 mg/ml formulations would

5    result in airway surface liquid concentrations in the endobronchial region that are approximately

6    1% less than a 60 mg/ml formulation of claim 1.  *See id*. at 5.10.  Likewise, Dr. Smaldone

7    testified that the respirable dose resulting from administering Defendants' 50 mg/ml formulations

8    is about the same as that resulting from administering a 60 mg/ml formulation.  *See id*. at 5.7.

9    Drs. Smaldone and Finlay thus concluded that Defendants' 50 mg/ml formulations are directly

10   covered by the "about 60 to about 200 mg/ml" limitation.  *See id*. at 4.4.  This expert evidence

11   stands unrebutted.

12   Defendants raise the reverse doctrine of equivalents as a defense to literal infringement,

13   citing alleged "differences between the Aerodose nebulizer and the eFlow nebulizer."  Def. Prop.

14   Findings of Facts, p. 21, ¶ 10.  However, "[n]ot once has [the Federal Circuit] affirmed a decision

15   finding noninfringement based on the reverse doctrine of equivalents."  *Tate Access Floors, Inc.*

16   *v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1368 (Fed. Cir. 2002)

17   Furthermore, the evidence does not support Defendants' claim of substantial differences

18   between the AeroDose and the eFlow.  Claim 1 of the '907 patent describes not just the AeroDose

19   nebulizer; rather, claim 1 gives the parameters for the family of high-efficiency vibrating

20   membrane system nebulizers of which the AeroDose and eFlow are both examples.  Smaldone

21   TR at 130:22-131:12.  As Dr. Challoner explained, "[t]he eFlow is actually strikingly similar to

22   the AeroDose.  It gives you the same mechanism for generating an aerosol . . . has a very similar

23   rate of aerosol output . . . [and] uses a similar mechanism to feed liquid to the aerosol generator."

24   Challoner TR at 61:20-62:8.  While the AeroDose is a breath-actuated device, and the eFlow is a

25   continuous output device, both devices are squarely covered by the parameters set forth in claim 1

26   of the '907 patent.  *Id*. at 531:22-534:22.

27   Accordingly, Defendants 50 mg/ml formulations of tobramycin solution literally infringe

28   claim 1 of the '907 patent.

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA                                    - 3 -                                    19796\940429.1

### B.     Doctrine Of Equivalents (50 mg/ml and 40 mg/ml)

The Defendants have done nothing more than lower the tobramycin concentration and increase correspondingly the volume of the solution, thereby keeping the dose in Defendants' 50 and 40 mg/ml solutions the *same* as that in their 100 mg/ml solutions.  *See* CPF at 2.4-2.9, 5.5 and 10.3.  What Defendants did is akin to administering two Tylenol® tablets each with a 300 mg dose instead of providing a single tablet with a 600 mg dose.

The doctrine of equivalents exists to guard patentees against exactly what has happened here:  to "prevents an accused infringer from avoiding liability for infringement by changing only minor or insubstantial details of a claimed invention while retaining the invention's essential identity."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 564 (Fed. Cir. 2000) (citation omitted).  A claim element is equivalently present in an accused process if "insubstantial differences" distinguish the missing claim element from the corresponding features in the accused process.  *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1359 (Fed. Cir. 2002).  The known interchangeability between two elements is an important factor in determining whether the elements are insubstantially different.  *Warner-Jenkinson, Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 36 (1997).  "[T]he known interchangeability test looks to the knowledge of a skilled artisan to see whether that artisan would contemplate the interchange as a *design choice*."  *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1383 (Fed. Cir. 2001) (emphasis added).  Courts have also applied the triple identity test; that is, if a feature in the accused process performs substantially the same function, in substantially the same way, to achieve substantially the same result, as the claimed element, they are equivalent.  *See Toro Co. v. White Consolidated Indus., Inc.*, 266 F.3d 1367, 1370 (Fed. Cir. 2001).

Defendants' own witnesses' testified, and their own documents reflect, that their 50 mg/ml and 40 mg/ml formulations are *deliberately designed* to deliver an equivalent respirable dose as compared to the enjoined 100 mg/ml formulations.  *See* CPF 2.8, 5.15, 7.7, 7.11 and 7.12.  Indeed, Defendants' own test results show that the 40 and 50 mg/ml formulations are equivalent to their admittedly infringing 100 mg/ml formulations.  *Id.* at 7.6 and 7.9; Tr. Exs. 72 and 72-A.  The stated objective of Defendants' *in vitro* respirable dose study is  "[t]o determine the volume

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA                    - 4 -                              19796\940429.1

fills and delivery times for two tobramycin concentrations, 40mg/ml and 50mg/ml, to generate an **equivalent** respirable dose to 150 mg tobramycin as 1.5ml of 100mg/ml in the eFlow."  Tr. Ex. 72 at SCF3067 (emphasis added).  The conclusion of this study — belatedly produced by Defendants after the close of evidence — confirms the equivalence of Defendants' 50 mg/ml and 40 mg/ml formulations with the admittedly infringing 100 mg/ml formulation:

> [T]he respirable delivery of tobramycin from the eFlow was calculated to . . . the **equivalent** dose as that of a 100 mg/mL solution . . . the fill volume of a 50 mg/mL solution will require twice the volume of a 100 mg/mL solution, and the 40 mg/mL solution will require the expected ratio of 100/40.

Tr. Ex. 72-A at SCF3140.  Defendants' counsel has even admitted that "[e]xhibit 72a confirms, as expected, that these new formulations have an **equivalent** respirable dose to Defendants' earlier formulation."  Resp. to Court Order re: Proposed Trial Exhibit 72A at 2 (emphasis added).  Indeed, "defendants **do not challenge the** evidence that they believe there is **equivalent** respirable dose between its 40mg/ml and 50mg/ml concentrations and its prior solution at 100 mg/ml in a 1.5ml volume."  *Id.* (emphasis in original, emphasis added).

Defendants also unabashedly testified about the deliberate equivalence of their new formulations to their prior infringing formulations.  For example, Keith Sledge of PSI said that his 40mg/ml formulations are designed to achieve the same respirable dose as the infringing 100 mg/ml formulation:

> Q.    But when the formulation has changed from 100 milligrams per milliliter to 40 milligrams per milliliter, the objective remains the same with regard to respirable dose, does it not?
>
> A.  Yes.
>
> Q.  And that objective is obtaining a respirable dose that is the same between the 40 milligrams per milliliter formulation and 100 milligrams per milliliter formulation, right?
>
> A.  Yes.

Sledge at Tr. Ex. 205-A at 208:4-13.  Likewise, Danny Downing of IV Solutions gave similar testimony regarding the deliberate equivalence of the respirable dose between Defendants' 50 mg/ml formulations and their prior infringing 100 mg/ml formulations:

> Q.  Well, certainly the goal, you would agree, is to have a respirable dose that is ultimately equivalent to TOBI, the FDA-approved medication; correct?

PLAINTIFF'S POST-TRIAL BRIEF          - 5 -
CASE NO. C-05-01938 WHA

A.  That would be the goal.

Q.  And the 100-milligram-per-milliliter formulation is being presented in the studies by PARI that you are forwarding to doctors as having an equivalent respirable dose to TOBI; right?

A.  That's what the paper shows, correct.

Q.  And certainly it's your hope and expectation, then, that the 50-milligrams-per-milliliter paper will have a similar respirable dose to that 100-milligrams-per-milliliter formulation?

A.  That's correct.

Downing at Tr. Ex. 213-A at 92:11-93:1.

In addition, Drs. Smaldone and Finlay testified that Defendants' 50 and 40 mg/ml tobramycin solutions are insubstantially different than—and interchangeable with—a 60 mg/ml formulation.  *See* CPF 5.12.  Dr. Smaldone found that Defendants' 50 and 40 mg/ml formulations deliver an equivalent respirable dose, and Dr. Finlay found that Defendants' 50 and 40 mg/ml formulations result in an equivalent airway surface liquid concentration, as compared to a 60 mg/ml formulation.  *See id*. at 5.7 and 5.9-5.11.  Further, Drs. Smaldone and Finlay explained that Defendants' 50 and 40 mg/ml formulations perform substantially the same function, in substantially the same way, to achieve substantially the same result as a 60 mg/ml formulation described in claim 1.  *See id*. at 5.13, 5.14 and 5.16.  Once again, this expert evidence is unrebutted.

Accordingly, overwhelming evidence proves that Defendants' 50 mg/ml and 40 mg/ml solutions are interchangeable with the claimed "about 60 to about 200 mg/ml" formulations.

### 1.      The '269 Patent Does Not Disclaim Equivalents

To the extent that a patentee may be precluded from invoking the doctrine of equivalents to recapture subject matter disclaimed in the patent specification, Federal Circuit precedents make clear that for this rule to apply, the patent specification must have "specifically identified, criticized, and disclaimed" the equivalent subject matter.  *See, e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001); *Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1342 (Fed. Cir. 2004) (holding that only a "clear disavowal" of

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA                      - 6 -                      19796\940429.1

1   subject matter precludes the application of doctrine of equivalents to recapture that subject

2   matter).

3       Chiron is not aware of any case holding or suggesting that statements made in a patent

4   incorporated by reference can constitute a disclaimer.  Chiron submits that statements made in a

5   prior art patent incorporated by reference cannot rise to the level of a specific identification,

6   criticism, and disclaimer that is necessary to establish a clear disavowal of equivalent subject

7   matter.  *See SciMed*, 242 F.3d at 1345.  First, the '269 patent specifically discloses that

8   concentrations below 60 mg/ml can be advantageously used.  *See* CPF 6.4.  Moreover, any

9   supposed disclaimer made in the '269 patent has to do with the prior art technology of the '269

10  patent using low efficiency nebulizers and has nothing to do with the accused embodiment that

11  Chiron seeks to prove as within the equivalent scope of the claims of the patent in suit.  *Se id*. at

12  6.2-6.3.  Statements critiquing the prior art in the context of a later patent are not sufficient to

13  clearly disavow those claims in the later patent.  *Micro Chemical v. Great Plains Chemical Co.*,

14  194 F.3d 1250, 1260 (Fed. Cir. 1999).

15      In *Micro Chemical* the Federal Circuit ruled that inclusion of a prior art reference that

16  contained certain limitations could not be translated as a disclaimer for purposes of the later

17  patent.  The Court stated:

18          [T]he district court read the patentee's statements about the Brewster prior
            art as a clear disavowal of the weigh dump method. To the contrary,
19          although the applicant noted certain inefficiencies in the Brewster system,
            the patent never clearly disavows the weigh dump method as being
20          incapable of performing the claimed functions. The statements relied on by
            the district court in both the background section and the prosecution history
21          were directed to a particular prior art device, the Brewster machine, not to
            the weigh dump method in general.
22

23      Accordingly, statements in the '269 patent do not constitute any disavowal of equivalent

24  subject matter in the '907 patent.  *See id*.

25              **2.      Prior Art Does Not Limit The Scope Of Equivalents**

26          "[T]the fact that a patent is an improvement patent does not automatically
            preclude application of the doctrine of equivalents.  'That a claim
27          describing a limited improvement in a crowded field will have a limited
            range of permissible equivalents does not negate the availability of the
28          doctrine [of equivalents] *vel non*.'"  (Quoting *Warner-Jenkinson Co.*, 520

PLAINTIFF'S POST-TRIAL BRIEF            - 7 -
CASE NO. C-05-01938 WHA                                          19796\940429.1

U.S. at 27 n. 4.)  "To determine the scope of the doctrine of equivalents in light of the prior art, a court can consider a 'hypothetical claim' that literally recites the range of equivalents asserted to infringe.  'The pertinent question then becomes whether that hypothetical claim could have been allowed by the PTO over the prior art.'"  *Id.* (quoting *Wilson Sporting Goods Co., v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed. Cir. 1990)).  "In order for this hypothetical claim to be anticipated, 'a single, prior art document [must] describe *every element* of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.'"  *Id.* at 1105-06 (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)) (emphasis in original).  "Likewise, to make the hypothetical claim obvious, the court must find that 'the differences between the subject matter sought to be patented [i.e., the hypothetical claim] and the prior art are such that *the subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'"  *Id.* at 1106 (quoting U.S.C. § 103(a) (1994)) (emphasis in original).

*Abbott Labs. v. Dey L.P.*, 287 F.3d 1097, 1105 (Fed. Cir. 2002)

In conducting this hypothetical claim analysis, it is improper to "compar[e] only the [a single] limitation of claim 1 to the [prior art] patent, . . .while ignoring other limitations of the claim."  *Id*.  Thus, in *Abbott* even though a prior art patent at issue described a range that overlapped with the hypothetical claimed range (75.0-95.5 vs. 68.6-94.5), the Federal Circuit held that the district court erroneously "concluded that the asserted range of equivalents was too broad because it encompassed the prior art" since "the [prior art] patent fails to disclose the [other] limitation[s]."  *Id.* at 1106.

It is further improper to focus on possible outer ranges beyond the scope of the asserted equivalent range.  The *Abbott* case states that since the patentee "only asserts an upper [equivalent] limit of 94.5%, [a]n examination of what happens in the extreme outer ranges of phospholipid content is therefore irrelevant to the scope of equivalents asserted by [the patentee]."  *Id.* at 1107.

No prior art of record would either anticipate or render obvious over a hypothetical claim to cover Chiron's asserted range of equivalents (from about 40 to about 200 mg/ml).  The only prior art of record, the '269 patent, does not anticipate nor render obvious a hypothetical claim encompassing the asserted range of equivalents.  *See* CPF 1.4-1.5 and 6.1-6.4.  Indeed, in the Examiner's Reasons for Allowance, the examiner does not say that the novel features of the

1  invention reside in the claimed concentration range.  Rather, the examiner made clear that the

2  crucial features reside in other aspects of the invention:

> The novel features of this invention reside in requiring 10 minutes or less
> for duration of nebulization, with an inhalation device having a rate of
> aerosol output of not less than 4 ml/sec that releases at least about 75% of
> the loaded dose and that produces particle sizes of between about 1 micron
> to about 5 microns.  The prior art of record, which is U.S. Patent number
> 5,508,269, discloses delivery of less than 50% of the loaded dose and a
> negative teaching to not use vials of less than 5 ml.  Applicant's [sic] data
> in the specification supports [sic] the advantages of the problems over the
> prior art. . . . Such novel features are neither taught nor anticipated by the
> prior art.

Challoner at RT 529:8-531:10; Tr. Ex. 96.  Based on the examiner's reasons for allowance, it is

clear that the examiner would have permitted a hypothetical claim covering the asserted

equivalence of 40 to about 200 mg/ml over the '269 patent.  Accordingly, Chiron is entitled to

have a range of equivalents to 40 mg/ml.

### 3.     Prosecution History Estoppel Does Not Apply

As an initial matter, even Defendants' own infringement analysis attorney concedes that

the doctrine of prosecution history estoppel does not apply with regard to the remaining issue in

this case, the scope of "about 60 to about 200 mg/ml."  Peterson Tr. at Ex. 221-A at 82:1-19,

82:24-83:13.

However, the Court asked whether during the course of prosecution of the '907 patent if

Chiron amended the patent claims in order to capture the parameters of the eFlow®.  J. Alsup

TR at 150:13-24.  Although the parameters identified in claim 1 of the '907 patent were added at

a point in time after Chiron was familiar with the eFlow®, the device characteristics were ***not***

added for the specific purpose of capturing the eFlow®.  Rather, the nebulizer parameters were

added in response to a request from the patent examiner to add device characteristics, and the

parameters added were already supported by the '907 patent specification.  Tr. Ex. 96, C-000139-

50; Tr. Ex. 95, col. 6, lines 35-49.

Finally, Defendants have noted in their proposed findings that during prosecution a claim

was submitted, and subsequently withdrawn, which recites a dose of at least 20 mgs of

tobramycin administered to the patient.  Tr. Ex. 96, pages 139-142; 153-154.  Canceling a

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA                          - 9 -                          19796\940429.1

1   dependent claim does not constitute relinquishment or surrender of any subject matter covered by

2   the broader independent claim, and there was therefore no "narrowing amendment" which is a

3   prerequisite for finding prosecution history estoppel. *Festo Corp.*, 535 U.S. at 737-38.  The

4   inventors merely canceled claim 27, which depends from claim 1 and defines an embodiment that

5   is narrower than the scope of claim 1.   The scope of claim 1 was not affected by the cancellation

6   of a dependent claim.  Further, the "about 60 to about 200 mg/ml" limitation in claim 1 was not

7   amended.

### 4.   FDA Standards For Safety And Efficacy Are Distinct From Patent Equivalence.

Defendants offered in evidence two letters written by Chiron — Trial Exhibits 215 and
216 — to the FDA regarding the safety and efficacy of Defendants' infringing 100 mg/ml
tobramycin formulation for use with eFlow®.  Defendants suggest that these letters are somehow
inconsistent with Chiron's position regarding equivalence between the accused method and the
method described in the '907 patent.  Nothing could be further from the truth as these letters do
not address patentability or equivalence issues, nor do they address a comparison of TOFIN with
the '907 patent.  Rather, Exhibit 215 addresses the potential safety consequences to cystic fibrosis
patients of using eFlow® to inhale tobramycin solution, and Exhibit 216 explains Chiron's
opposition to SourceCF's suitability petition requesting permission to file an ANDA.  Both letters
were written for the express purpose of addressing specific regulatory concerns related to safety
and efficacy.

The PTO does not evaluate the safety and efficacy of drugs and devices; rather, Congress
has given the responsibility for evaluation of the safety and efficacy of drugs and devices to the
FDA.  *See Scott v. Finney*, 34 F.3d 1058, 1063-64 (Fed. Cir. 1994) ("Testing for the full safety
and effectiveness of a prosthetic device is more properly left to the Food and Drug Administration
(FDA).  *Title 35 does not demand that such human testing occur within the confines of Patent and
Trademark Office (PTO) proceedings*." (emphasis added) (citations omitted)).  Therefore,
Defendants' attempt to use these letters in this arena as a means to distinguish their drug-device

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

- 10 -

19796\940429.1

1    combination from the claimed invention of the '907 patent for the purposes of a doctrine of

2    equivalents infringement analysis is misguided.

3            Substantively, the letters do not support Defendants' position in this case.  Exhibit 215

4    was written "[b]ecause of the potential safety consequences [of the intended use of eFlow with

5    tobramycin solution without FDA approval] for patients with cystic fibrosis."  Tr. Ex. 215 at

6    JD0492, introductory paragraph.  Chiron therefore "request[ed] an opportunity to discuss these

7    issues [with FDA] . . . and propose[d] potential methods to better assure the safe and effective use

8    of the [eFlow] inhaler."  *Id.*  This letter contains no statements, and contributes nothing, relevant

9    to the issues of infringement before this Court.

10           Likewise, the statements made in Exhibit 216 address standards for safety and efficacy

11   under the FDA guidelines in connection with a petition filed by SourceCF seeking FDA's

12   approval that SourceCF's proposed TOFIN product (100 mg/ml of tobramycin in a 1.9 ml

13   volume) be considered as *identical* to the FDA-approved TOBI (60 mg/ml tobramycin in a 5 ml

14   volume).  Chiron opposed SourceCF's request for permission to file an ANDA because "the

15   proposed changes in drug concentration, volume, and formulation clearly raise serious questions

16   of safety and effectiveness and require that animal and clinical investigations be conducted to

17   assure the proposed product is safe and effective."  Tr. Ex. 216, JD0500.  Dr. Challoner explained

18   the rationale for Chiron's opposition to the suitability petition:

19              Oh, as I said, it's very cut-and-dried in terms of FDA's own rules for the
                approval of a generic drug, which is what we're talking about in this suitability
20              petition for an ANDA; so my oppositions were, number one, that the application
                did not demonstrate that the tobramycin content and impurities and degradants
21              were identical to the branded drug tobramycin, and number two, that the intended
                formulation differed substantially from the branded drug tobramycin.
22              So as I said, these are FDA's own rules.  The intent of a generic drug is to
                be essentially identical to the branded drug.
23
     Challoner TR at 553:25-554:10.  *See also* Chiron's Resp. to Def. Prop. Findings of Facts 33-36,
24
     110-11.  Dr. Challoner goes on to explain that there is no inconsistency between Chiron's position
25
     as set forth in the FDA letters and Chiron's position in this litigation regarding equivalence
26
     because the topic of equivalence between Defendants' accused method and the '907 patent is not
27

28

Farella Braun & Martel LLP
235 Montgomery Street, 30th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. C-05-01938 WHA

- 11 -

19796\940429.1

1   addressed in the letters, which were in essence "basically repeating to the FDA their own rules for

2   approving a generic drug."  Challoner RT at 557:20-558:10.

3   **IV.     CONCLUSION**

4          For the foregoing reasons, Chiron respectfully requests that this Court enter an injunction

5   preventing Defendants from continuing to infringe the '907 patent.

6

7   DATED:  May 1, 2006                          FARELLA BRAUN & MARTEL LLP

8

9                                                By: /s/_____
                                                         Mark D. Petersen
10

11                                               Attorneys for Plaintiff
                                                 CHIRON CORPORATION
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S POST-TRIAL BRIEF                     - 12 -                          19796\940429.1
CASE NO. C-05-01938 WHA